SEAS SHIPPING COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 107931. Promulgated November 17, 1942.

*Frank V. Barns, Esq.*, for the petitioner.
*Walt Mandry, Esq.*, for the respondent.

**OPINION.**

SMITH, *Judge:* The first question for decision is whether the petitioner is entitled to deduct from its gross income of 1938 $10,491.97 representing the cost of insurance chargeable to voyages completed prior to 1938, and $49,670.40 representing the cost of repairs to the *SS*

*Greylock* during the months of October and November 1938, which amounts were not paid until January 1939. The respondent has disallowed these deductions upon the ground that the petitioner was on the cash basis for 1938 and that, since the amounts were not disbursed during that year, they are not legal deductions from gross income.

The petitioner admits that since it did not obtain permission from the Commissioner to change its basis of reporting for 1938 from the basis formerly used to a full accrual basis it is not entitled to make its return for 1938 upon the full accrual basis. It does contend, however, that it is entitled to make such return upon the same basis as its returns for prior years were made and that according to such basis it is entitled to deduct $10,491.97 of its general expenses and $49,670.40 for repairs made to the *SS Greylock* during a lay-up period which was completed in 1938.

Section 41 of the Revenue Act of 1938 provides in part as follows:

SEC. 41. GENERAL RULE.

The net income shall be computed upon the basis of the taxpayer's annual *accounting period (fiscal year or calendar year, as the case may be)* in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner *does clearly reflect the income.* * * *

Section 43 of the same Act provides in part:

SEC. 43. PERIOD FOR WHICH DEDUCTIONS AND CREDITS TAKEN.

The deductions and credits (other than the corporation dividends paid credit provided in section 27) provided for in this title shall be taken for the taxable year in which "paid or accrued" or "paid or incurred," dependent upon the method of accounting upon the basis of which the net income is computed, unless in order to clearly reflect the income the deductions or credits should be taken as of a different period. * * *

The question presented is whether the petitioner's books of account kept in the manner in which they were kept until they were changed during the latter part of 1938 clearly reflect income. The respondent has made no determination that the books of account so kept do not correctly reflect net income. His point is that the books of account prior to the change made in the latter part of 1938 were kept upon the cash basis and that therefore the petitioner is not entitled to deduct the amounts in question.

It appears from the evidence that prior to the change made in its system of accounting in 1938 all expenses chargeable to completed voyages ended during the calendar year and all costs of repairs made to a steamship during a lay-up period which were completed during the calendar year were charged as expenses of the calendar year, even though paid after the close of the year. They have always been

claimed and allowed prior to 1938 as expenses of the calendar year. The only change made in the petitioner's books of account for 1938 was to place administrative and general expenses not chargeable to completed voyages or lay-up periods upon a full accrual basis the same as all other items of expense. This is borne out by the fact that the respondent in amending the petitioner's return for 1938 made no change in the deduction of expenses chargeable to completed voyages shown in the return for 1938, which was made upon the full accrual basis. The respondent has, however, denied the deduction of the cost of repairs to the *SS Greylock* which were made in 1938, solely because they were not paid until 1939.

We think that the method of accounting regularly employed by the petitioner prior to the change made in its accounting system clearly reflected its net income for each year. The petitioner appears to have kept its books of account upon the same basis as numerous other steamship companies. See *Planet Line, Inc.*, 34 B. T. A. 253; affd. (C. C. A., 2d Cir.), 89 Fed. (2d) 16; *Alfred E. Badgley*, 21 B. T. A. 1055; affd. (C. C. A., 2d Cir.), 59 Fed. (2d) 203. We also think that the petitioner's income tax return for 1938 should have been filed upon the same basis as for prior years. Upon such basis petitioner is entitled to deduct from gross income the cost of repairs to the *Greylock*.

A different situation obtains, however, with respect to the item of $10,491.97. The petitioner admits that this is an amount which should have been charged to voyages completed prior to 1938. If they had been so charged they would not have appeared as deductible expenses of 1938. They were never accruals of 1938 nor disbursements of 1938. The action of the respondent in disallowing this deduction is approved.

The final question for decision is whether the petitioner is entitled to exclude from its gross income of 1938 $150,976.18 which it had deposited in 1938 in a capital reserve fund which was under the joint control of the petitioner and of the United States Maritime Commission. The petitioner claims that this amount is exempt from income tax under section 607 (f) of the Merchant Marine Act of 1936, as amended by section 28 of the Act of June 23, 1938; 52 Stat. L. 961, which was changed to read (§ 607 (h)):

(h) Exemption of reserve funds from taxation. The earnings of any contractor receiving an operating-differential subsidy under authority of this chapter, which are deposited in the contractor's reserve funds as provided in this section, except earnings withdrawn from the special reserve funds and paid into the contractor's general funds or distributed as dividends or bonuses as provided in paragraph 4 of subsection (c) of this section, shall be exempt from all Federal taxes. Earnings withdrawn from such special reserve fund shall be taxable as if earned during the year of withdrawal from such fund. * * *

The Merchant Marine Act of June 29, 1936, 49 Stat. L., 1985, is entitled: "An Act To further the development and maintenance of

an adequate and well-balanced American merchant marine, to promote the commerce of the United States, to aid in the national defense, to repeal certain former legislation, and for other purposes." It will be seen from the foregoing that this act was for the purpose of building up a merchant marine which would be available to the United States in times of war or national emergency. For a number of years prior to the enactment of this act shipping companies of the United States found it impossible to compete with shipping companies of foreign countries which paid lower wages to their seamen and other employees and where the expenses of operation were much less than those of the shipping companies of this country. The act provided for the creation of the United States Maritime Commission, which was to contract with shipping companies of this country for the payment to them of an operating differential subsidy. The amount of this subsidy was the excess of cost of certain items of operation which the companies of this country had to pay over those of foreign competitors. The United States Maritime Commission was given large authority over companies which contracted with it for an operating differential subsidy.

At the time of applying for the operating differential subsidy the petitioner owned and operated four steamships, each of 10,400 dead weight tons, which were completely depreciated from an income tax standpoint. It also owned all of the capital stock of the Greylock Steamship Corporation, which owned the *SS Greylock* of 11,012 dead weight tons, which the petitioner operated under a charter from that company. This steamship was not completely depreciated upon the books of the Greylock Steamship Corporation. All of the steamships operated by the petitioner were nearing the end of their useful life. The petitioner's balance sheet at January 1, 1938, showed that it had assets of $900,512.02, capital stock of $1,530,300, and an operating deficit of $1,137,827.64. The petitioner was desirous of acquiring new steamships.

The petitioner was given an operating differential subsidy contract by the United States Maritime Commission under date of October 14, 1938. This contract provided, among other things: (1) that the petitioner should consolidate or merge the Greylock Steamship Corporation with itself; (2) that it should prepare plans and specifications for the construction of three cargo vessels suitable for the trade and satisfactory to the Commission to replace the older vessels then owned by the company; (3) that the petitioner should obtain an additional cash investment in the company of at least $500,000 and an additional $250,000 if and as required by the Commission; and (4) for future corporate adjustments and the details of operation. The contract further provided:

2. *Period of the Agreement.* Except as otherwise specifically provided herein, this agreement shall be applicable to the entire period from the date hereof to and including the date of termination of the last voyage with respect to which subsidy payments may be made hereunder. Subject to the terms and conditions hereof, subsidy payments shall be made hereunder with respect to operation and maintenance of the subsidized vessels, including the voyages on the subsidized service on which sailings outbound from the last United States port are made on or after the date hereof and on or before April 14, 1939, and (in event of extension of the agreement as herein provided) subsequent voyages which are scheduled to be completed on or before the date of termination fixed by such extension.

The Merchant Marine Act and the contract between the petitioner and the United States Maritime Commission provided for the establishment of (1) a capital reserve fund, and (2) a special reserve fund. Both of these funds when established were to be under the joint control of the petitioner and the United States Maritime Commission. As is shown by our findings the petitioner was required to establish the capital reserve fund not later than November 30, 1938. It was required to deposit in that fund "sums aggregating at least 75 percentum of the net profit of the Operator as then determined by the Operator, before depreciation, on voyages on which accounts· are finally settled during the calendar year 1938." A special reserve fund was required to be established at or before the time of the first annual accounting provided for in the contract. Section 34 of the contract provided in part:

34. *Special Reserve Fund.* * * *

There shall be deposited in the special reserve fund at the time of each annual accounting hereunder the amount, if any, of the net profits of the operation of the subsidized vessels in excess of 10 per centum per annum on the Operator's capital necessarily employed in the operation of the subsidized vessels remaining after deducting any payments made from such net profits into the capital reserve fund * * *.

The petitioner was not required to establish the special reserve fund during the calendar year 1938 and no such fund was established.

Section 607 of the Merchant Marine Act of 1936, as amended by section 27 of the Act of June 23, 1938, 52 Stat. L. 960, provides in part as follows:

(g) With the approval of the Commission, the contractor may voluntarily increase the amount of either or both reserve funds by depositing in such fund or funds any or all of the earnings otherwise available for distribution to stockholders, or may transfer funds. from the special reserve funds to the capital reserve fund.

Paragraph 33 of the contract of October 14, 1938, provides in part:

During the period of this agreement, payments shall be made from the capital reserve fund (except in exceptional circumstances as provided in the next sentence of this paragraph) for the following purposes and no others:

(i) Payment of the principal when due of all notes secured by mortgage on the subsidized vessels, and with the consent of the Commission, payment of any sums owing but not yet due on such notes so secured.

(ii) The purchase of replacement vessels or reconstruction of vessels or additional vessels to be employed by the Operator on an essential foreign-trade line, route, or service approved by the Commission.

The exceptional circumstances mentioned in the parenthesis in the above quotation were to cover operating losses on the subsidized vessels after the special reserve fund had been exhausted.

In compliance with the provisions of the contract the petitioner, prior to the close of 1938, estimated that its earnings for the calendar year before the deduction of any depreciation would amount to approximately $200,000. It was required prior to November 30, 1938, to establish its capital reserve fund and it deposited $75,000 with the Guaranty Trust Co. of New York on November 29, 1938, as a part of its estimated earnings for the year. It later deposited in that fund in 1938 additional amounts aggregating $75,976.18. The $976.18 deposited was for the purpose of closing out an old account which the petitioner had with the Guaranty Trust Co.

The petitioner claims that under section 607 (h) of the Merchant Marine Act of 1936, as amended, the portion of its earnings for 1938 deposited in the capital reserve fund are exempt from income tax in 1938.

Under its contract with the United States Maritime Commission the petitioner was to receive an operating differential subsidy only in respect of outward bound voyages beginning after the date of the contract. It is the contention of the respondent that the earnings referred to in section 607 (h) of the Merchant Marine Act, as amended, embrace only the earnings of the contractor for voyages begun after the date of the signing of the subsidy agreement. He submits that, since there were no voyages begun by the petitioner after October 14, 1938, which were completed within the calendar year 1938, the petitioner is not entitled to exclude from its taxable earnings of that year any portion of the amount deposited as earnings in the capital reserve fund in 1938. He states that any other construction of section 607 (h), as amended, would extend the exemption to earnings of a steamship company prior to its right to receive an operating differential subsidy and that it is not to be presumed that Congress in granting the subsidy to steamship companies with respect to their operation of vessels was also granting a wholesale exemption from tax with respect to any and all earnings that might be deposited in a reserve fund provided for by an agreement entered into subsequent to the earning of the deposited amounts.

He further argues that if the statutory language were doubtful or ambiguous there is no exemption, for "It has been said many times that

provisions granting special tax exemptions are to be strictly construed." *Helvering* v. *Northwest Steel Rolling Mills, Inc.*, 311 U. S. 46; *United States* v. *Stewart*, 311 U. S. 60; *United States Trust Co. of New York* v. *Helvering*, 307 U. S. 57; *Superintendent of Five Civilized Tribes* v. *Commissioner*, 295 U. S. 418.

We do not think that there is any ambiguity in the language used by Congress in section 607 (h) of the Merchant Marine Act of 1936, as amended. That section says that "The earnings of any contractor receiving an operating differential subsidy under authority of this chapter, which are deposited in the contractor's reserve funds as provided in this section * * * shall be exempt from all Federal taxes." This section of a long and complex statute must be interpreted in the light of all the provisions of the statute. By the Merchant Marine Act, as we have seen, Congress was principally concerned in building up a merchant marine. The act was not primarily for the benefit of the operator. It was for the benefit of the United States. The Congress was interested in having a large and up-to-date merchant marine which could be availed of in case of war or national emergency. It is true that it was not the intention of Congress to permit an operator to earn money which could be distributed as dividends which would be exempt from income tax. The statute makes ample provision to protect the revenues in any case where earnings are withdrawn from reserve funds for distribution to its stockholders. The capital reserve fund is dedicated to a particular purpose. It is to be used for the replacement of subsidized vessels and for the construction of new vessels, all of which were to be in accordance with the plans and requirements of the United States Maritime Commission.

That section 607 (h) is not to be narrowly construed is apparent from the fact that Congress provided that an operator could deposit not only a percentage of its earnings, but all of them. When they were deposited they were removed from the operator's general funds. They could not be used for the payment of any income taxes or any other taxes.

It was well known by the Maritime Commission at the time that the contract of October 14, 1938, was signed that the petitioner would have no earnings from subsidized operations during the year 1938. It, nevertheless, required it to deposit at least 75 percent of its earnings for the entire year 1938 in the capital reserve fund. They were deposited at a time when the petitioner was entitled to receive an operating differential subsidy in respect of all operations after the date the contract was entered into. The statute is specific that earnings deposited in the capital reserve fund "shall be exempt from all Federal taxes." We do not think that it was the intent of Congress that only the earnings from subsidized operations are to be exempt from all Federal taxes.

The record in this case shows that in years subsequent to 1938 the petitioner was required by orders of the Commission to deposit in the capital reserve fund earnings from unsubsidized operations and it is also clear both under the laws and the contract that interest earned by an operator upon deposits in the capital reserve fund must be retained in that reserve fund as a part thereof. The intricate accounting which would be required by limiting the exemptions as the respondent suggests condemns it as not being within the intent of Congress.

It should be noted that only earnings of the contractor are to be exempt from tax. The deposits which the petitioner was required to make in the capital reserve fund in 1938 were before the deduction for depreciation. The petitioner's income tax return for 1938 shows that the only depreciation claimed on the return is in the amount of $2,214.78, which represents depreciation on the *SS Greylock* from November 18 to December 31, 1938. Manifestly, that depreciation may not be deducted from gross income in the tax return and also be claimed as an exclusion from gross income in the deposits made in the capital reserve fund. Therefore, in any event, the exclusion from gross income of earnings deposited is $150,976.18 less $2,214.78, or $148,761.40.

Our conclusion is that the petitioner is not liable to income tax for 1938 upon any part of its earnings for that year deposited in the capital reserve fund.

Reviewed by the Court.

*Decision will be entered under Rule 50.*