**PUBLIC SERVICE COMPANY OF NEW MEXICO, Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 80–70.**

United States Court of Appeals, Tenth Circuit.

Sept. 30, 1970.

Carolyn R. Just, Atty., Dept. of Justice, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson and Grant W. Wiprud, Attys., Dept. of Justice, Washington, D. C., on the brief), for appellant.

Felix Atwood, Dallas, Tex. (William B. Keleher, of Keleher & McLeod, Albuquerque, N. M., on the brief), for appellee.

Before BREITENSTEIN, HILL and HOLLOWAY, Circuit Judges.

HILL, Circuit Judge.

This litigation arises out of the internal revenue laws and specifically concerns the recovery of alleged excessively assessed income taxes for 1962. The sole issue is whether Public Service Company of New Mexico qualifies during the year in question for an investment credit under 26 U.S.C. § 48, in the construction of No. 3 Unit—Reeves Station at Albuquerque, New Mexico.

The trial court, sitting without a jury, concluded that Public Service had been erroneously denied the investment credit on the 1962 return, and accordingly granted judgment for the $193,505.80 in excess taxes assessed, plus $9,729.08 in paid-in interest, along with statutory interest and costs. On appeal the United States contends that the undisputed facts do not support the conclusion that the Company was entitled to the section 48 investment credit on the total cost of constructing and equipping the power plant which had a tax basis of $6,450,-193.21.[1]

Public Service Company is a New Mexico corporation in the business of furnishing electrical energy and water. In its 1962 corporate income tax return, appellee claimed an investment credit on "new section 38 property" with a tax basis of $6,450,193.21. The property in question is the new No. 3 Unit at Reeves Station—an electrical supply station. The Government disallowed the investment credit on the ground that the taxpayer itself had constructed and equipped the power plant and was thus limited, under section 48, to an investment credit only on the portion of the costs incurred after December 31, 1961.

Section 38 of the Internal Revenue Code of 1954,[2] authorizes a credit for investment in certain depreciable property. Sections 46(c) (2) and (c) (3) [3] in sub-

1. By stipulation the United States has conceded that Public Service has met all the requirements of the internal revenue laws to entitle it to an investment credit with a tax basis of $6,450,193.21, except that the Government does not accede that such amount is allowable under 26 U.S.C. § 48.

2. 26 U.S.C. § 38 [as added by Sec. 2(a), Revenue Act of 1962, P.L. 87–834, 76 Stat. 960].

3. 26 U.S.C. § 46 [as added by Sec. 2(b), Revenue Act of 1962, P.L. 87–834, 76 Stat. 960].

stance allow an investment credit of three percent for section 38 property which is public utility property with an expected useful life of eight years or more, including property used predominantly in the business of furnishing electrical energy. Section 48(b) of the Code [4] provides that new property qualifies as new section 38 property only if "(1) the construction, reconstruction, or erection of which is completed by the taxpayer after December 31, 1961, or (2) acquired after December 31, 1961, if the original use of such property commences with the taxpayer and commences after such date." Section 48(b) further provides in effect that where construction is completed by a taxpayer after December 31, 1961, the taxpayer is entitled to the credit only on the portion of the basis which is properly attributable to construction costs incurred after December 31, 1961. No such limitation exists as to property in the second category.

In January, 1960, Public Service entered into an agreement with Stearns-Rogers Manufacturing Company, for the construction of No. 3 Unit. The plant was to consist of a 66,000 kilowatt hydrogen cooled turbine-generator; a steam generating unit capable of producing certain pressures and temperatures; a surface condenser with necessary pumps; a cooling tower; a 115/13.8 KV main power transformer; a regenerative feedwater heating system with necessary pumps; and a main power plant building. The agreement was a cost-plus contract for which Stearns-Rogers was to be paid its costs plus a fixed fee of $400,000. The contract provided that Stearns-Rogers would supply "the required engineering design, drafting, accounting, purchasing and expediting of materials and the furnishing of supervision, labor, and other requirements nec-

essary for the construction of the 66,000 kilowatt No. 3 Unit." Significantly, the contract stated: "It is the intent and spirit of this proposal that we [Stearns-Rogers] will furnish the necessary engineering and construction facilities to turn over to you a complete operating unit. Our engineers, draftsmen, and construction forces will perform the necessary services to design the proposed plant in complete coordination with your representatives." This was a dominant element in the trial court's conclusion that Stearns-Rogers had physical possession and control of the plant site and component parts until No. 3 Unit became operational.

Without indulging in a lengthy narration of the facts as viewed by the United States, followed by our own analysis, we will forego the former and proceed directly to the latter. A number of facts group themselves into the camp of financing and legal ownership. The Company received competitive bids on the major plant components, was the consignee of those items and paid about $7,000,000 for them and thus was their legal owner. In addition, the Company secured builder's risk insurance covering the equipment during construction and, along with Stearns-Rogers, was a beneficiary under such policies.

■ We agree with appellee that legal title prior to acquisition (assuming for the moment the plant was not constructed by Public Service) is irrelevant to the ultimate decision. It is plainly reflected in 26 C.F.R. § 1.48–2(c), example 3,[5] that because the items were purchased in 1961 by Public Service does not remove the property from qualified investment status. And in Madison Newspapers, Inc. v. Commissioner of Internal Revenue, 47 T.C. 630, 635 (1967), that court, in a similar case, stated:

4. 26 U.S.C. § 48 [as added by Sec. 2(b), Revenue Act of 1962, P.L. 87–834, 76 Stat. 960].

5. "In 1961, a taxpayer pays the entire purchase price of $10,000 for section 38 property to be delivered in 1962. In 1962

he takes possession of the property and commences the original use of the asset in that year. The $10,000 amount shall be taken into account in computing qualified investment in new section 38 property for 1962." Accord, Rev.Rul. 69–249, 1969–1 Cum.Bull. 31.

"The fact that the major pieces of the three units were physically present at petitioner's place of business on or before December 31, 1961, is not determinative. Nor is the fact that on or before that date petitioner paid the freight and insurance * * * the expenses of installation, or a large portion of the purchase price. Respondent's regulations specifically provide that payment is not the touchstone." The builder's risk insurance is of equal insignificance. The positioning of legal title to the component parts is ample explanation for this exercise in caution.

Right of control is the touchstone in this suit. 26 C.F.R. § 1.48–2(b) (1) states: "Property is considered as constructed, reconstructed, or erected by the taxpayer if the work is done for him in accordance with his specifications." It is apparent that the purpose of this regulation is to distinguish between work done by independent contractors and mere employees. With that dichotomy in mind, we note that the regulation would defeat the investment credit if "specifications" refers to the control and supervision which every owner has the right to exercise over the general work.

The generally accepted standard for determining independent contractor status [6] is ably set out in New Mexico case law: "The principal test is whether the employer has the right to control the manner in which the details of the work are to be accomplished, not the exercise of any control at all. But neither mere suggestions by the employer nor the 'directing control essential to co-ordinate the several parts of a larger undertaking' affect the relationship. Campbell v. Smith, 68 N.M. 373, 362 P.2d 523." Scott v. Murphy Corporation, 79 N.M. 697, 448 P.2d 803, 806 (1968).

It would be patently absurd for a utility company to only generally describe the yet-to-be constructed plant and expect the contractor to fill in all the technical data and performance details.

Manifestly, Public Service was free to enumerate technical specifications for the power plant and at the same time remain free to claim an investment credit on the entire cost of acquisition. Only if it had authoritative control with respect to the manner and means in which and by which the details of the work were to be performed would the Company be limited to a credit on the basis of construction costs after December 31, 1961.

There does not appear in the record any direct testimony that Public Service controlled the details of plant construction, or that they did anything more than specify the technical data and performance expectations sought from the completed installation.

Public Service had neither the staff nor the ability to design or build a power plant such as No. 3 Unit; they relied entirely on Stearns-Rogers for that. In addition to the plans of the Company, Stearns-Rogers prepared between three hundred and four hundred plans and drawings which specified how the facility was to be constructed. It was repeatedly stated at trial that Stearns-Rogers was solely responsible for the design, erection and initial operation of the plant.

Although there were meetings and consultations between the Company and the contractor, their purpose was to determine the adaptability of specific components to the Company's overall objectives. Specifically, it was told that Stearns-Rogers presented the taxpayer with specifications and if anything appeared to be improper, Public Service called it to the former's attention, with suggestions, "but it was their [Stearns-Rogers'] responsibility."

It was Stearns-Rogers who supplied field supervision of construction; and they provided all mechanics, such as welders, ironworkers, pipefitters and all other laborers and other craftsmen. When the machinery and component

6. The variously phrased test is exhaustively considered in 56 C.J.S. Master and Servant § 3; and 35 Am.Jur. Master and Servant § 5.

parts were shipped, the contractor's employees signed for them, unloaded them, warehoused them and actually took physical possession of them, and ultimately erected them within the framework of the building also constructed by the contractor. No one of these items paid for by appellee would serve any useful purpose to appellee but all of them properly fitted together by the contractor, together with the building, constituted a complete unit which was operational and served the purpose intended by appellee. It was this complete operational unit that Stearns-Rogers agreed to construct from the many components and deliver to appellee as an electrical power generating plant.

Public Service did have an employee on the job site nearly every day, but his function was limited. Our observation is that it would be a natural occurrence to have such personnel on the construction site, inasmuch as it was a cost-plus contract where inattention would permit unnecessary waste and cost. Moreover, the testimony was unequivocal that the job of this man was only that of an inspector who in fact acted much like a liaison man between the contracting parties.

Finally, it is virtually unrefuted that the construction superintendent, a Stearns-Rogers employee, who had complete control over the entire project, took orders only from his employer. The directives under which he guided plant construction originated only in the Stearns-Rogers Denver offices, and from plans and drawings sent to him by that office. In his own words, he did nothing unless Denver directly ordered it or unless it appeared in the plans. This completely negatives the unsupported allegation that the Public Service man on the job site made structural alterations.

In sum, Stearns-Rogers controlled the construction of the facility from the original excavation work until it was turned over to the taxpayer. The former received, stored, took possession of and was responsible for the incoming component parts and equipment and decided how, when and by whom it would be erected. And when the final hookups were completed, they tagged the equipment which forbade anyone to handle it except their start-up crew.

The Government produced no witnesses and sought to sustain its position by what it considered weaknesses in the Company's case. The attempt was abortive for the evidence does not preponderate in proving that the Company in any manner controlled plant "construction," as that term is used in the Code. Stearns-Rogers was an independent contractor who followed taxpayer's specifications as to results desired, but who independently designed, engineered, constructed and turned over to Public Service Company a complete operating power station.

Other arguments raised by the Government, e. g., the guarantee on defective material and workmanship, the Company's method of accounting and specific designation of expenditures, and the progress reports issued by Stearns-Rogers to the Company, have received due consideration, but are not deemed as indicia sufficient to lodge control over the details of construction in Public Service.

The evidence was uncontradicted that the plant was not ready to be tested, and was not in fact tested, until after December 31, 1961. Public Service gained actual physical control of the plant in mid-1962. 26 C.F.R. § 1.48–2(b) (6) provides that: "Property shall be deemed to be acquired when reduced to physical possession, or control." We thus conclude, as did the trial court, that No. 3 Unit—Reeves Station, Albuquerque, New Mexico, was acquired by Public Service Company after December 31, 1961, within the meaning of section 48(b) (2), 26 U.S.C.

Affirmed.