**LYKES BROS. STEAMSHIP CO., INC.**

v.

**The UNITED STATES.**

**No. 375–69.**

United States Court of Claims.

March 19, 1975.

Daniel M. Gribbon, Washington, D. C., Atty. of record, for plaintiff; Harris Weinstein, John D. Taurman, Covington & Burling, Washington, D. C., of counsel.

Gilbert W. Rubloff, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant.

Valentine Brookes, San Francisco, Cal., filed a brief for Pacific Transport Co. and subsidiaries as amicus curiae; Lawrence v. Brookes, Brookes, Brookes & Vogl, San Francisco, Cal., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

OPINION *

COWEN, Chief Judge:

This case concerns the application of the investment tax credit provisions of the Internal Revenue Code of 1954, 26 U.S.C. §§ 38, 46–48, and the applicable regulations.[1] Plaintiff, Lykes Brothers Steamship Company, is a Louisiana corporation engaged in foreign commerce as a common carrier. It is the successor in interest to a prior corporation of the same name which operated the steamship business in 1962 (both corporations are referred to herein as plaintiff or taxpayer).

Plaintiff originally filed suit to recover an alleged overpayment of its Federal income tax for tax years 1958 through 1962. The claims for the years 1958 through 1961 were settled by the parties

---

* We agree with the result reached by Trial Judge Lloyd Fletcher but have modified and expanded the grounds upon which his conclusion is based. We also agree with his findings of fact and have set out so much thereof as are necessary to a decision in this case.

and dismissed by a stipulation filed with the court on February 8, 1974. The settlement also disposed of all issues raised by the taxpayer with respect to its tax liability for 1962, other than the single issue presented here for resolution.[2]

The specific issue presently confronting us is whether certain vessels constitute property "the construction * * * of which is completed by the taxpayer after December 31, 1961" in accordance with section 48(b)(1) so that plaintiff is entitled only to a limited tax credit, or whether the investment credit for these ships should be measured by plaintiff's entire basis in the vessels pursuant to section 48(b)(2). Since we find that the vessels in question were not constructed "by the taxpayer" within the purview of section 48(b)(1) and instead were property "acquired after December 31, 1961" under section 48(b)(2), plaintiff was entitled to compute its investment tax credit based on the entire basis in the vessels. It may, therefore, recover on its claim.

There is little, if any, dispute as to the facts which are material to the resolution of the legal issues. Plaintiff operates a fleet of 21 vessels of the Gulf Pride class built under the construction-differential subsidy (CDS) program established by the Merchant Marine Act of 1936, ch. 858, §§ 501–09, 49 Stat. 1995, as amended, 46 U.S.C. §§ 1151–1161. The CDS program has been administered at various times by the Federal Maritime Board (FMB) and the Maritime Administration (MARAD), and these agencies are sometimes collectively referred to herein as Maritime.[3] The program was designed to put American shipowners on equal footing with their foreign counterparts. The Government subsidy covers the difference between the amount it costs an American operator to get his ship built in the United States and what its foreign competitors would have to pay for a similar ship constructed by a foreign shipbuilder. At the time of the construction of the vessels in question, the subsidy normally totaled 50–55 percent of the actual construction costs.

In return for the payment of the construction subsidy, the Government exercises certain controls over the construction projects. Prior to the award of a construction subsidy, Government approval of the design of the new vessels and its determination, among other things, that such new vessels will aid in the promotion of the foreign commerce of the United States are required. 46 U.S.C. § 1151(a). A Government finding that the vessels will be suitable for use in national defense, if required, is also a prerequisite to the subsidy award. 46 U.S.C. § 1151(b). Maritime maintains an Office of Ship Construction, which reviews the financial, economic, and technical data and presentations that are submitted by prospective shipowners in support of CDS applications. To discharge these functions, the Office contains a qualified and competent technical staff, including architects and engineering specialists.

This case involves four vessels, the *Leslie Lykes,* the *Brinton Lykes,* the *Shirley Lykes,* and the *Marjorie Lykes,* which were constructed under the CDS program. The circumstances leading to the construction of these vessels began in the early 1950's. At the start of the Korean War, the American Merchant Marine was composed primarily of ships built prior to or during World War II. Anticipating that the nation's fleet would soon be obsolete, Maritime began

---

2. The remaining issue was previously presented to the court in 1971 on the parties' cross-motions for partial summary judgment. On June 14, 1971, the court denied both motions without prejudice and remanded the case to the trial judge for further proceedings on the application of Treasury Regulation § 1.48–2(b)(1). The case is again before the court, this time on defendant's exceptions to the trial judge's report.

3. From May 1950 to August 1961, the FMB and MARAD jointly administered the CDS program. After 1961 MARAD administered the program alone. *See* 1950 Reorganization Plan No. 21, 64 Stat. 1273; 1961 Reorganization Plan No. 7, 75 Stat. 840.

various programs to replace and modernize the fleet. In 1950, the Government began construction of a number of cargo vessels under the designation known as the "Mariner." These vessels had the largest cargo designation (C4) and were capable of surface speeds of 20 knots or more. After the ships were built by the Government, they were ultimately sold or leased. Shortly thereafter, Maritime's staff devised and prepared plans, specifications, and designs for a number of cargo vessels, including a designation called the "Clipper," which was to be the replacement for the medium-sized C2 and C3 class vessels.

Starting in 1954, Maritime asked plaintiff and other shippers to comment on the suitability of the "Mariner" and the "Clipper" as replacement vessels for their fleets. Plaintiff advised Maritime that neither design was satisfactory and countered with a suggestion for a more acceptable replacement vessel. Although the counterproposal was of the same general character as the Maritime "Clipper" proposal, it differed from it in nearly every respect except for the type of machinery and the number of passengers it could hold. The major differences were in the beam, the horsepower, and the normal sea speed.[4] Plaintiff's initial proposal (as well as the ship finally constructed) was essentially a different vessel from that originally suggested by the Government.

While not rejecting plaintiff's proposal out of hand, Maritime informed plaintiff in mid-1955 that the data and specifications presented on the proposed vessel lacked the detail necessary for a decision on plaintiff's application for CDS. Maritime recommended that plaintiff obtain expert assistance for this purpose, whereupon plaintiff retained Gibbs and Cox as its naval architects to prepare the necessary design and specification work. In December 1955, plaintiff applied to Maritime for CDS and supported the application by an "outline specification" which had been prepared by Gibbs and Cox. Although these plans did not contain sufficient detail for bids or construction by a shipyard sufficient data was provided to define the type and quality of ship suitable for plaintiff's needs and to enable Maritime to determine whether such a vessel was acceptable to it.

Plaintiff's proposed vessel had 8,500 horsepower, with a maximum sustained speed capability of 16.7 knots. In February 1956, Maritime and plaintiff met in Washington, D.C. to discuss this portion of plaintiff's proposal. At this meeting Maritime continued to adhere to its original 18-knot speed requirement by invited plaintiff to offer further submissions demonstrating that 18 knots was not a necessary requirement for plaintiff's particular trade. In November 1956, on the basis of facts submitted by plaintiff, a compromise was made in which Maritime agreed to a vessel with a 17.5-knot speed capacity and 9,000 horsepower. In a letter to plaintiff dated November 30, 1956, Maritime supplemented a recitation of the terms of the speed and horsepower agreement with the following:

> * * * [I]t is to be understood that the said action does not constitute approval of the basic design in its entirety, but is limited to the speed question. It remains incumbent upon you to have your design agent submit 12 sets of a complete preliminary design at the earliest possible date in order that the Office of Ship Construction and Repair may advise the Federal Maritime Board, from an engineering standpoint, with respect to the adequacy of the revised design on an overall basis in relation to the needs of the service, and so that the appropriate other Offices of the Maritime Administration may furnish their comments to the Federal Maritime Board with respect to said revised design.

---

4. Plaintiff's main problem with the proposed replacements concerned their size and speed, which plaintiff felt were not suitable for its particular trade·routes and type of business. Indeed, the "Clipper" was thought to be too wide for some of the port facilities used by plaintiff.

After a compromise was reached concerning the speed and horsepower requirement, Maritime approved the application for CDS for five vessels, subject to further approval of the bidding or contract plans and specification to be developed by Gibbs and Cox. When the contract plans and specifications were submitted, Maritime critically reviewed them through various interdepartmental committees, and this examination generated almost 400 adverse comments. These comments were the subject of further discussions resulting in compromises which were ultimately approved by Maritime. Thereafter, the contract plans and specifications were used to invite construction bids from domestic shipyards, and Maritime determined the eligibility and responsibility of each bidder.

The construction contracts for the four ships involved in this case were awarded to the Bethlehem Steel Company and its subsidiary, the Bethlehem-Sparrows Point Shipyard, Inc. (hereinafter collectively referred to as Bethlehem) for construction in the shipyard located at Sparrows Point, Maryland. The vessels were constructed under two contracts: one entered into in 1958 (FMB–83), for the *Leslie Lykes*, and the other signed in 1960 (FMB–122) covering the other three vessels. Both contracts were three-party

arrangements among the United States, represented by the Federal Maritime Board, taxpayer, and the shipbuilder. Under the contracts, Bethlehem undertook to furnish all labor and materials and to perform all work necessary to construct, complete and deliver (at its own risk and expense) the vessels called for in the contract.[5] The contract "Specifications" approved by Maritime defined the vessel's performance characteristics and the type of materials to be used for construction. The "Plans" found in the approved contract set forth the approximate layout of the ships' hulls, decks, and compartments. However, the "Plans and Specifications" were insufficient to enable the shipyard employees actually to construct the vessels; instead, Bethlehem was required to rely on "working plans" in the actual building of the vessels. The "working plans" provided the specific directions to the shipyard's workmen for the task of physically assembling the vessels. While the "working plans" are a direct outgrowth of the contract plans and specifications, they often require basic design and engineering judgments. In this case, Bethlehem was able to use the detailed "working plans" that had been developed by the Ingalls shipyard in constructing a prior group of vessels in the Gulf Pride classifications.[6] Bethlehem also selected

5. With certain immaterial exceptions, the contract signed in 1960 contained the same terms and conditions as the 1958 contract. Article I of the Special Provisions section of the 1960 contract provided:

"(a) The Contractor shall furnish all labor and material and shall perform all work necessary to construct, build, complete and deliver, at its own risk and expense, four (4) single screw vessels, MA Design C3–S–37b (in these Special Provisions called the 'Vessels'), in strict accordance with the Plans and Specifications referred to in Article II hereof, including National Defense Features, and will do everything required of the Contractor by this Contract (these Special Provisions and the General Provisions attached hereto and made a part hereof, and the Plans and Specification), including the installation of any outfitting and equipment which the Plans and Specifications provide shall be furnished by the Owner and including the development of working plans, all for the consideration of Thirty Six Million

Two Hundred Thirty Eight Thousand Four Hundred Dollars ($36,238,400.00) (herein called the 'Contract Price'), together with such additions and subject to such deductions as are herein provided."

6. Plaintiff's first group of five Gulf Pride class vessels was constructed by Ingalls Shipbuilding Corporation and bore MARAD design designation C3–S–37a. In this designation, "C" stands for cargo vessel, "3" is an indication of length, "S" signifies steam propulsion. "37" is the number in the series of C3–S designs that have received MARAD designations, and the small letter "a" permits differentiation among series of the C3–S–37 design. The second group of four Gulf Pride class vessels, which included the *Leslie Lykes*, was constructed by Bethlehem. The design of these vessels was the same as that for the first five vessels, and they were also designated C3–S–37a. The third group of four Gulf Pride class vessels, which included the *Brinton Lykes*, the *Shirley Lykes*, and the *Marjorie Lykes*, was construct-

the suppliers for the materials to be used in the ships' construction.

In sum, the detailed design, engineering, and construction work was left to the employees of Bethlehem. Throughout the construction process, the vessels were in the physical possession of Bethlehem and its employees. During the construction period, plaintiff had no right to control or make any use whatsoever of the four vessels for any purpose.

After construction and prior to delivery to plaintiff, each of the vessels underwent dock and sea trials conducted by the Maritime Administration Trial and Guarantee Survey Board, which determined whether the vessel conformed to the requirements of the construction contract.[7] The vessels could not be delivered to plaintiff without having passed these trials. The four vessels at issue were actually delivered and made available to plaintiff for use in its business at various times during 1962.

On its Federal income tax return for calendar year 1962, plaintiff claimed an investment credit in the amount of $1,080,128.99. A portion of this claimed credit was attributable to plaintiff's share of the cost of construction of the four vessels. On January 13, 1967, the Commissioner of Internal Revenue disallowed plaintiff's claim for full investment credit with respect to plaintiff's entire cost of these vessels, relying in part on the ground that the portions of the vessels constructed prior to December 31, 1961, were not eligible for investment credit under section 48(b)(1) of the Code.

After paying the income tax deficiency relating to this claim, plaintiff, on March 24, 1969, filed a timely claim for refund of Federal income taxes for calendar year 1962 in the amount of $998,-290.50, plus interest, disputing the partial disallowance of investment credit for

these vessels as well as other items. Plaintiff's claim for refund was denied in full by a statutory notice of disallowance dated May 1, 1969, and plaintiff timely filed its petition in this court.

### I

The investment tax credit provisions were initially added to the 1954 Code by section 2 of the Revenue Act of 1962, Pub.L. No. 87–834, 76 Stat. 962. This Act authorized the allowance of a tax credit for investment in certain depreciable property. The vessels in this case are property within this category. *See* § 48(a)(2)(B)(iii). The 1962 Act authorized the taxpayer to claim a credit equal to seven percent of the basis of a "qualified investment." *See* § 46(a)(1). In section 46(c)(1)(A) "qualified investment" was defined, in part, as the "applicable percentage of the basis of each new section 38 property (as defined in section 48(b)) placed in service by the taxpayer during such taxable year." We are concerned here with the transitional rules in section 48(b) relating to the extent to which particular items could be treated as "new section 38 property" and hence eligible for credit. Section 48(b) provides:

(b) *New section 38 property.*—For purposes of this subpart, the term "new section 38 property" means section 38 property—

(1) the construction, reconstruction, or erection of which is completed by the taxpayer after December 31, 1961, or

(2) acquired after December 31, 1961, if the original use of such property commences with the taxpayer and commences after such date.

In applying section 46(c)(1)(A) in the case of property described in paragraph (1), there shall be taken into

---

ed in the same Bethlehem shipyard as the second group of vessels. Because of an increase in horsepower, the design of the third group differed somewhat from that of the prior nine vessels and was designated by Maritime as C3–S–37b.

7. At the same time, the United States Coast Guard, the American Bureau of Shipping, the United States Public Health Service and others conducted detailed inspections and tests for safety, seaworthiness, and sanitation.

account only that portion of the basis which is properly attributable to construction, reconstruction, or erection after December 31, 1961.

Under this section, the credits for investments in property described in category (1) are limited to that portion of the taxpayer's basis in the property that is attributable to costs during the period after the statutory cut-off date, December 31, 1961. There is no such limitation for credit claimed on property classified in category (2).

In interpreting section 48(b), Treasury Regulations section 1.48–2(b) provides in part:

> (1) Property is considered as constructed, reconstructed, or erected by the taxpayer if the work is done for him in accordance with his specifications.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (6) Property shall be deemed to be acquired when reduced to physical possession, or control.

Plaintiff rests its case primarily on the argument that it is entitled to the tax credit measured on the entire basis of the four vessels in issue because these vessels were "acquired" after December 31, 1961, in accordance with section 48(b)(2) of the Code and Treasury Regulation section 1.48–2(b)(6). Plaintiff argues that the availability of the full credit under section 48(b)(2) does not depend on the unavailability of the restricted credit under section 48(b)(1). In this regard, plaintiff emphasizes that section 48(b)(1) was designed to serve a limited purpose of allowing partial credit in situations which were not already subject to section 48(b)(2); and that even if the vessels in issue could be classified within both sections 48(b)(1) and 48(b)(2), plaintiff is entitled to the benefits of section 48(b)(2). In addition, plaintiff contends that the four vessels in issue

were not constructed "by the taxpayer" within the meaning of section 48(b)(1).

Defendant, for its part, maintains that the vessels were constructed "by the taxpayer" under section 48(b)(1) of the Code, because the vessels were built for plaintiff in accordance with its plans and specifications within the meaning of Treasury Regulation section 1.48–2(b)(1). The defendant also raises what has been termed the "mutual exclusivity" argument, that is, that sections 48(b)(1) and 48(b)(2) were intended to apply to different types of situations. Defendant's argument follows that since the vessels in question were constructed "by the taxpayer," they are not "acquired" property within the meaning of section 48(b)(2).

Defendant's position ultimately rests on its contention that the vessels were constructed "by the taxpayer" under section 48(b)(1). Since we do not agree with this argument, we need not deal with two alternative arguments of the parties. Solely for the purpose of deciding this case, we assume (as the Government argues) that section 48(b)(1) and section 48(b)(2) apply to different categories and that if the property in this case falls within section 48(b)(1), plaintiff will receive only a limited credit.[8]

## II

The main question is whether the four vessels in issue constitute property constructed "by the taxpayer" within the meaning of section 48(b)(1). Giving the words "by the taxpayer" their ordinary meaning, plaintiff would have to be the maker of the property or the one with control over the details of the construction of the vessels before section 48(b)(1) would apply. The legislative history of this section does not specifically define the phrase "by the taxpayer," and the legislative background does not contain anything which would lead us to depart from the plain meaning of the statute.

---

8. While the court order of June 14, 1971, remanded the case to the trial judge for a determination of whether the plans and specifications for the vessels were the product of taxpayer's employees and agents within the meaning of Treasury Regulation 1.48–2(b)(1), the court is not limited to this narrow issue in determining whether the case falls within section 48(b)(1). *Cf.* Carter v. United States, 509 F.2d 1150, 206 Ct.Cl. ––– (1975).

■ In implementing the credit, Congress chose the December 31, 1961, cut-off date and adopted basically the same transition rules which were added to the Internal Revenue Code in 1954 in section 167(c) to deal with the application of the newly liberalized depreciation provisions. See H.R.Rep.No.1447, 87th Cong.2d Sess. 10 (1962); S.Rep.No.1881, 87th Cong.2d Sess. 15 (1962), U.S.Code Cong. & Admin.News, 1962, p. 3304. But the legislative history of section 167(c),[9] like that of section 48(b), does not provide much aid in defining the scope of section 48(b). The language of the statute itself is the best indication of the legislative intent. Congress often expresses its will in the customary meaning of the language it uses, and when, "[t]he requirements of the [statute] are detailed and specific, * * * [they] must be applied with precision." Commissioner v. Gordon, 391 U.S. 83, 91–92, 88 S.Ct. 1517, 1523, 20 L.Ed.2d 448 (1968); see, e. g., Braunstein v. Commissioner, 374 U.S. 65, 69–73, 83 S.Ct. 1663, 10 L.Ed.2d 757 (1963); Hanover Bank v. Commissioner, 369 U.S. 672, 687, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962); First Nat'l Bank of Chicago v. United States, 38 F.2d 925, 931, 69 Ct.Cl. 312, 325 (1930), aff'd, 283 U.S. 142, 51 S.Ct. 378, 75 L.Ed. 913 (1931).

### III

Defendant bases its interpretation of section 48(b)(1) largely upon Treasury Regulation 1.48–2(b)(1), which provides that "[p]roperty is considered as constructed * * * by the taxpayer if the work is done for him in accordance with his specifications." Basically, defendant argues that the vessels were built exclusively for the taxpayer in accordance with contract plans and specifications which were attributable to plaintiff, and consequently, under the regulation, the vessels were constructed "by the taxpayer." We disagree.

■ This regulation seeks to provide a standard for determining the extent to which property constructed *for* the taxpayer will be considered to have been constructed *by* him within the meaning of section 48(b)(1). It is significant that the statute itself does not include property constructed *for* the taxpayer—it merely speaks of the construction, recon-

---

**9.** Like the investment credit, the liberalized depreciation methods introduced into the Code in 1954 were designed to stimulate economic growth. H.R.Rep.No.1337, 83d Cong., 2d Sess. 24 (1954), U.S.Code Cong. & Admin.News, 1954, p. 4025. The House version of the 1954 transition rules drew the distinction between "acquired" property "the construction, reconstruction, or erection of which is completed after December 31, 1953." H.R. 8300, 83d Cong., 2d Sess. 41 (1954). The House committee interpreted this latter provision as applying to property constructed by the taxpayer. See H.R.Rep.No.1337, *supra* at 23, U.S.Code Cong. & Admin.News, 1954, p. 4025. In discussing the transition rules, the House committee proposed to limit the application of the new depreciation methods to new assets "acquired" after the effective date of the bill primarily as a means of minimizing revenue losses and obtaining maximum incentive effect. *Id.* As for the property in construction by the taxpayer at the cut-off date, the House committee does not explain the limitation, and it is interesting that the Senate took exception to this provision because it discriminated against the taxpayer who "conducted the construction himself" and because it created an administrative problem in determining the portion of the cost incurred after the cut-off date. S.Rep.No.1622, 83d Cong., 2d Sess. 28–29 (1954), U.S.Code Cong. & Admin.News, 1954, p. 4629. With the matter thus in dispute, the Conference committee agreed to accept the limitation in the House bill, restricting the new methods to that portion of the basis of property attributable to the construction, reconstruction or erection after December 31, 1953. H.R.Rep.No.2543, 83d Cong., 2d Sess. 29 (1954), U.S.Code Cong. & Admin.News, 1954, p. 5280. The Conference committee report does not indicate why the House version was accepted, but it appears that the Conference committee considered and rejected the Senate position.

Although the phrase "by the taxpayer" was not included in section 167(c)(1), the Treasury Regulations eliminated the possibility of giving this section a broad interpretation by limiting it to construction, reconstruction, or erection by the taxpayer. See Treas.Reg. § 1.167(c)–1(a). This regulation also provided that the property would be considered constructed by the taxpayer if the work was done for him in accordance with his specifications. *Id.* This latter provision goes beyond the Congressional discussions preceding the enactment of section 167(c).

struction, or erection of property *by* the taxpayer. The implication that the word "by" is not intended to mean "for" is strengthened by looking at the larger statutory phrase "which is completed by the taxpayer." The words "completed by" connote an active participation by the taxpayer in the completion of construction and hence in the construction itself. Thus, taken literally, the regulation could expand the coverage of section 48(b)(1) beyond its statutory language, and it is well established that a regulation which "operates to create a rule out of harmony with the statute, is a mere nullity." Manhattan Gen. Equip Co. v. Commissioner, 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936).

■ However, we recognize that Treasury Regulations should normally be given great weight in our determinations and must be upheld unless they cannot be interpreted in line with the statutory language they seek to explain. Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831 (1948); Fawcus Mach. Co. v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 75 L.Ed. 397 (1931); Wills v. Commissioner, 411 F.2d 537, 543 n. 1 (9th Cir. 1969). Furthermore, we are presently confronted with a situation where Congress delegated specific authority to the Commissioner, in section 38(b), to formulate regulations dealing with the investment credit. As we stated in Coca-Cola Bottling Co. v. United States, 487 F.2d 528, 532, 203 Ct.Cl. 18, 26 (1973):

> [S]ection 1.48–1(b) of the Treasury Regulations is entitled to even more than the usual great weight accorded Treasury Regulations * * *.

From our study of the regulation presently in issue, we find that it is susceptible to a construction consistent with the terms of the statute. We, therefore, need not find that regulation invalid in whole or in part.

■■ The regulation implies that the taxpayer must have control over the project before it will be considered to be constructed, reconstructed, or erected by him, but the scope of the term "specifi-cations" is unclear. General or limited control over the contract plans and specifications is, in and of itself, insufficient to establish the degree of control necessary to find that the property was constructed "by the taxpayer." If plaintiff has such control over the details of the work that it is the maker of the property, or constructs the property itself, then there is a sufficient nexus between the construction and the taxpayer for the construction to be "by the taxpayer" within the meaning of section 48(b)(1).

This is not the first time this regulation has been interpreted by the courts. In Public Service Co. of New Mexico v. United States, 431 F.2d 980 (10th Cir. 1970), the Tenth Circuit was faced with a similar problem of determining whether the restricted credit provisions of section 48(b)(1) applied. In that case, the taxpayer, a utility company, was engaged in the business of furnishing electrical energy and water. In 1960, the taxpayer entered into a contract with Stearns-Rogers Manufacturing Company for the construction of a plant to contain a 66,000-kilowatt hydrogen-cooled turbine generator. The contract provided that Stearns-Rogers would supply "the required engineering design, drafting, accounting, purchasing and expediting of materials and the furnishing of supervision, labor, and other requirements necessary for the construction of the 66,000 kilowatt No. 3 Unit." 431 F.2d at 982. The turbine-generator was to be constructed on taxpayer's property, and Public Service specified the technical data and performance expectations required from the turbine-generator. The new generator plant was not tested until after December 31, 1961, and Public Service did not gain actual control of the plant until mid-1962.

The Internal Revenue Service, as in the present case, ruled that section 48(b)(1) applied to the transaction. In reversing this ruling, the court stated:

> *Right of control is the touchstone in this suit.* 26 C.F.R. § 1.48–2(b)(1) states: "Property is considered as constructed, reconstructed, or erected by

the taxpayer if the work is done for him in accordance with his specifications." It is apparent that the purpose of this regulation is to distinguish between work done by independent contractors and mere employees. *With that dichotomy in mind, we note that the regulation would defeat the investment credit if "specifications" refers to the control and supervision which every owner has the right to exercise over the general work.*

\* \* \* \* \* \*

It would be patently absurd for a utility company to only generally describe the yet-to-be constructed plant and expect the contractor to fill in all the technical data and performance details. *Manifestly, Public Service was free to enumerate technical specifications for the power plant and at the same time remain free to claim an investment credit on the entire cost of acquisition.* Only if it had *authoritative control* with respect to the manner and means in which and by which the details of the work were to be performed would the Company be limited to a credit on the basis of construction costs after December 31, 1961. 431 F.2d at 983. [Emphasis added.]

■ We agree with the Tenth Circuit that the right of control is the most important factor to be considered in determining whether the work is done for the taxpayer "in accordance with his specifications." However we need not go so far as to hold that the taxpayer is entitled to recover upon a finding, without more, that the Bethlehem Steel Company filled the role of an independent contractor in the construction of the Lykes Bros. ships. There are important factual differences between the cases. In *Public Service Company of New Mexico*, the construction agreement was a two-party contract between Public Service and Stearns-Rogers. The taxpayer owned the land upon which the plant was constructed. It purchased the major plant

components from a supplier and furnished them to a contractor, and the taxpayer also enumerated certain technical specifications for the power plant. There was no third party who had the right to control any portion of the design or construction.

By contrast, the case before us involves three contracting parties: the plaintiff, the Government represented by the Federal Maritime Board, and the contractor. The question as to whether plaintiff had the necessary control over the construction of the four vessels must, to a very large extent, be answered by the degree of supervision and control which the Government was authorized to exercise from the initiation of the project until the completion and delivery of the vessels. This significant factor was not present in the *Public Service Company* case.

IV

■ On the facts of this case, plaintiff did not exercise sufficient control over the construction of the vessels to bring the property within the provisions of section 48(b)(1) or Treasury Regulation 1.48–2(b)(1). While the parties dispute whether the contract plans and specifications can be deemed to belong to the taxpayer for purposes of determining the investment credit, it is clear that in accordance with the requirements of the construction-differential subsidy program, the Government exercised a large degree of control over the contract at all stages from the beginning to the final completion of the project. Maritime had the right to control the design specifications in every detail.[10] Maritime examined the "outline specification" submitted with the application for subsidy in 1955 and found it lacking in the horsepower requirement. After negotiations, a compromise was reached, increasing the horsepower of the vessel from plaintiff's suggested 8,500 to 9,000. When plaintiff later submitted the proposed contract plans and specifications, Maritime "critically reviewed" them, and this

---

**10.** *Cf.* Seas Shipping Co., 1 T.C. 30, 39 (1942), dismissed on appeal (*nol. pros.*), (2d Cir. 1944).

detailed examination generated almost 400 adverse comments. The comments ranged from the location of the captain's quarters to the size of bolts for the ventilation system. After additional negotiations, the contract plans and specifications were approved by Maritime. Maritime supervised the awarding of the construction contracts. Under the terms of the contracts, the Federal Maritime Board had the final word (short of resort to the courts) as to whether the specifications should be amended after the contracts were awarded. The Maritime Administration Trial and Guarantee Survey Board determined whether the vessels were built consistently with the contract requirements. Thus, plaintiff's right of control over the construction of the vessels was remarkably less than that of an ordinary buyer who contracts to have a building or a machine constructed by another company.

It is not enough to say that the vessels were designed to a large extent to make them satisfactory for plaintiff's commercial needs. Nor is it important that Maritime did not change a great percentage of the proposed contract plans and specifications submitted to it. Defendant concedes that Maritime had the authority to condition the grant of CDS upon the building of a vessel entirely different from that desired and requested by the applicant, and Maritime exercised that control in numerous instances.

Maritime's control was far greater than that which prevails in a situation where a construction project has to conform to few minor requirements of a regulatory body.

In addition to the Government's control over the project, there are other factors which demonstrate plaintiff's lack of control of Bethlehem's construction operation. The ships were not built on plaintiff's property. They were constructed in Bethlehem's shipyard at Sparrows Point, Maryland, far removed from Louisiana, plaintiff's state of incorporation. At all material times during construction of the vessels, Bethlehem maintained

physical possession and control over the vessels.

Bethlehem's relation to the other contracting parties was that of an independent contractor. Under the construction contract, Bethlehem was required to furnish the labor and materials, to perform all the work, and to deliver the vessels at its own risk.

The contract plans and specifications, which plaintiff participated in formulating, were insufficient to enable the shipyard employees to construct the vessels. The vessels were built by the shipyard's employees from detailed working plans. While Bethlehem had a contractual obligation to prepare such working plans, it was able to utilize the working plans developed by the Ingalls Shipyard for construction of a prior group of Gulf Pride vessels.

The contract required Bethlehem to submit the working plans to plaintiff and the Federal Maritime Board for approval, and until approved, all such work would be at the shipyard's own risk. Also, the working plans were tailored to the contract requirements, and inspectors representing Maritime, Gibbs and Cox, and plaintiff were present at the construction site during the construction of the vessel. While these two provisions tend to support defendant's position, they must be evaluated against many other factors, including the Government's right of control and Bethlehem's overall responsibility for construction of the vessels. When so considered, we think the balance tilts in favor of a conclusion that the vessels were not constructed "by the taxpayer" within the meaning of section 48(b)(1) or "in accordance with [its] specifications," as that phrase in the regulations should be interpreted.

V

One of defendant's principal contentions is that the "specifications" regulation distinguishes between items which are built to order according to the taxpayer's individual requirements ("cus-

tom-built") and property which can be supplied out of ordinary stock or "off the shelf." To support this distinction, defendant argues that the limitation "by the taxpayer" was used because of the administrative problem which could arise in determining the construction status on the cut-off date of property manufactured or built by someone other than the taxpayer, such as in the case of a manufacturer of standard items which can be purchased off-the-shelf or from a catalog. Defendant concludes that the "specifications" regulation properly treats custom-built property as that constructed "by the taxpayer," and excludes off-the-shelf items.

The weakness of this argument lies in the fact that there is no support for it in the language or background of section 48(b) or in its forerunner, section 167(c). The examples given in the committee reports and in the Treasury Regulations do not suggest this distinction. If Congress intended to make such a distinction, there is no indication of it. The fact that the Senate committee, when considering the House version of section 167(c), noted that the House limitation for construction in process on January 1, 1954, created a difficult administrative problem in determining the portion of the cost incurred after December 31, 1953 (S.Rep.No.1622, 83d Cong., 2d Sess. 29 (1954), U.S.Code Cong. & Admin. News, 1954, p. 4629), does not show that the limitation to construction by the taxpayer was made to simplify the administrative burden.

Moreover, in the same report, the Senate committee noted that the limitation for property constructed by the taxpayer would discriminate against the taxpayer who "conducted the construction himself" as compared with a taxpayer who purchased a "new building" after December 31, 1953. Thus, the Senate committee did not treat the House bill as one distinguishing between custom-built and off-the-shelf items; rather the committee recognized it as a distinction based on who performed the work.

In rejecting defendant's contentions, we are influenced by the manifest purpose of Congress to stimulate economic development by means of the investment credit. While sections 48(b)(1) and 48(b)(2) establish a cut-off date for the extension of investment credit, these sections must be read in conjunction with the general purpose for allowing investment credit. The credit was designed to encourage the modernization and expansion of the Nation's production facilities by immediately reducing income taxes, with the result, *inter alia*, of increasing the capital funds available for investment. It was hoped that the credit would improve the country's economic potential, increase job opportunities, and better the country's competitive position in the world economy. *See* H.R.Rep.No.1447, 87th Cong., 2d Sess. 8 (1962); S.Rep.No.1881, 87th Cong., 2d Sess. 11 (1962), U.S.Code Cong. & Admin.News, 1962, p. 3304. In view of this objective, we do not think that Congress intended for the investment credit provisions, including the transitional rules, to be applied as restrictively as defendant would apply them in this case. It is generally recognized that remedial legislation should be construed liberally in order to effectuate its purpose. *See, e. g.,* Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); Piedmont & N. Ry. Co. v. Interstate Commerce Comm'n, 286 U.S. 299, 311–12, 52 S.Ct. 541, 76 L.Ed. 1115 (1932). In applying various sections of the investment credit statute, this court and other courts have noted that the Act should be interpreted liberally in keeping with its purposes, Alabama Displays, Inc. v. United States, 507 F.2d 844, 205 Ct.Cl. 716 (1974); Minot Fed. Sav. & Loan v. United States, 435 F.2d 1368, 1372 (8th Cir. 1970); Northville Dock Corp., 52 T.C. 68, 73 (1969), and this case is no exception.

The Government's position that section 48(b)(1) applies to all custom-made items would reduce the economic effect of the credit during transitional years. Such an interpretation would give widespread

application to the limitation of the tax credit on property which defendant would classify under section 48(b)(1) and thereby reduce the amount of credit which otherwise might be available to taxpayers under section 48(b)(2). Furthermore, because custom-built items are normally more expensive than off-the-shelf items, the Government's interpretation would have the effect of restricting the credit available for the expensive custom-built items, while allowing it on the cheaper items. We believe that our reading of the phrase "by the taxpayer" in section 48(b)(1) is more consistent with the statutory objective of encouraging economic development than the interpretation proposed by defendant.

## VI

 Finally, we must determine whether the property at issue was "acquired" by the plaintiff after December 31, 1961, pursuant to section 48(b)(2). In this regard, we are guided by Treasury Regulation 1.48–2(b)(6), which states that "Property shall be deemed to be acquired when reduced to physical possession, or control." Our inquiry regarding the time of physical possession is simplified in this case, since Bethlehem was required under the contract to make an actual tender of delivery of the completed vessels to plaintiff.[11] It is established that the actual delivery dates of the four vessels were as follows: the

Leslie Lykes, February 2, 1962;[12] the Brinton Lykes, June 29, 1962; the Shirley Lykes, August 31, 1962; and the Marjorie Lykes, November 16, 1962. On the delivery dates, the certifying documents for each vessel issued by the Coast Guard, the American Bureau of Shipping, the Public Health Service, and others were delivered to plaintiff.

In addition, plaintiff did not act in a manner consistent with possession or control of the vessels until after the vessels were actually delivered. It was not until after delivery and acceptance that plaintiff was able to place the vessels into service, for prior to such delivery, plaintiff had no right to make any use of the ships whatsoever.[13] For example, plaintiff placed its crews on board the ships for the first time after delivery, when the vessels were removed from the shipyard as required by the contract. Prior to delivery, the vessels could be manned only by personnel employed by Bethlehem. Similarly, plaintiff was first obligated to buy insurance coverage for the vessels after delivery. Prior thereto, while the vessels were in the possession and under the control of Bethlehem, the shipyard was obligated, under the contract, to maintain full insurance coverage for the ships. Thus, by taking delivery of the vessels during 1962 and by placing the new vessels in service for the first time thereafter, plaintiff "acquired" the vessels after December 31, 1961,

---

11. Article I(b) of the Special Provisions section of the 1958 contract (FMB–83), which is substantially the same as Article I(b) in the contract signed in 1960, provided in pertinent part:

"Upon completion of the work * * * and after passing the tests provided in the Plans and Specifications and this contract, the Vessels as completed shall be delivered to the Owner alongside a safe and accessible pier at the Shipyard * * * free and clear of all liens * * *. Upon such delivery, the Owner shall give the Contractor a receipt for the Vessels and shall * * * remove or cause the Vessels to be removed from the Shipyard."

12. The original delivery date scheduled for the Leslie Lykes in the contract was October 17, 1961, but the ship was actually delivered in 1962.

13. Courts previously have held that taxpayers "acquired" property for investment credit purposes when the property was placed in operating condition by the manufacturer, notwithstanding that they had taken possession of the finished components at an earlier time. In Forest City Publishing Co. v. United States, 72–1 U.S.T.C. para. 9143 (N.D.Ohio 1971), the court held that the taxpayer "acquired" a printing press only after it was assembled by the manufacturer and placed in service during 1962 rather than in 1961 when the unassembled components were delivered to the taxpayer's premises. See also The LTV Corp., 63 T.C. 39 (1974); Madison Newspapers, Inc., 47 T.C. 630 (1967).

within the plain meaning of section 48(b)(2) and Treasury Regulation 1.48–2(b)(6).

## CONCLUSION

Since plaintiff's vessels qualify for the investment credit under section 48(b)(2), and not under section 48(b)(1), plaintiff is entitled to recover on its claim, and we remand the case to the trial judge for a determination of the amount of its recovery pursuant to Rule 131(c).