GOODSON-TODMAN ENTERPRISES, LTD., AND ITS SUBSIDIARY CORPORATIONS, MID-HUDSON PUBLICATIONS, INC., CACTUS PRODUCTIONS, INC., ULSTER OFFSET CORP.; PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10604–81.     Filed February 25, 1985.

---

■■■■■■■■■■

*Robert A. Schulman, Lyman G. Friedman,* and *J. Alan Galbraith,* for the petitioners.*

*Theodore J. Kletnick, David M. Brandes,* and *Dennis M. Bresnan,* for the respondent.

STERRETT, *Judge*: In his notice of deficiency dated March 26, 1981, respondent determined deficiencies in petitioners' Federal income taxes for the taxable years ended March 31, 1973, March 31, 1974, and March 31, 1977, in the respective amounts of $33,604, $160,587, and $11,482.[1] The ultimate issue for decision is whether, pursuant to sections 38 and 48(k), I.R.C. 1954, petitioners are entitled to claim investment tax credits with respect to the videotaped television series, "To Tell The Truth."

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.[2] Goodson-Todman Enterprises, Ltd. (hereinafter referred to as petitioner), is a corporation duly organized and existing under the laws of the State of New York. At the time the petition in this case was filed, petitioner's principal place of business was located in New York, New York. Petitioner's subsidiary corporations, Mid-Hudson Publications, Inc., Cactus Productions, Inc., and Ulster Offset Corp., are involved in this proceeding only by reason of having filed consolidated income tax returns with petitioner.

---

*Brief amici curiae was filed by Sheldon S. Cohen, Roger A. Pies, and Howard J. Hoffman as attorneys for Barry Productions, Inc., and Enright Enterprises, Inc.

[1]Investment tax credits claimed by petitioners for the taxable years 1975, 1976, and 1978, and carried over and carried back to the taxable years for which the deficiencies were determined were also disallowed by respondent and therefore are in issue in the instant case.

[2]In their briefs, the parties refer to this case as being "submitted fully stipulated" or submitted with "a complete Stipulation of Facts." This case, however, was not submitted pursuant to Rule 122, Tax Court Rules of Practice and Procedure, and each party has objected to the opposing party's proposed findings of fact. The objections relate to the proper inferences to be drawn from documents stipulated into evidence. We have made our own findings based on the stipulation of facts and the documents stipulated into evidence.

Since the early 1950s, the principal business of petitioner and related entities has been the production of television programs. Petitioner is an established producer in the television industry. Among other productions, petitioner and its related entities have produced "What's My Line?", "I've Got a Secret", "Password", "Family Feud", "The Price is Right", and "Beat The Clock".

In the fall of 1956, petitioner commenced production of the television series "To Tell The Truth" (hereinafter referred to as TTTT). Production of this series was the principal business activity of petitioner. TTTT was successful. It was televised during both prime time and daytime over the CBS network from 1956 through 1969. From 1969 through 1980, the series was taped to be syndicated to various stations throughout the United States. The syndicated shows were produced during the years that are before the Court.

TTTT's format remained substantially the same throughout its history. Each TTTT show was one-half hour in duration and normally consisted of two "spots." Each show was taped before a live audience and subsequently televised. Appearing on each show were a master of ceremonies or "emcee," four celebrity panelists, and contestants (three per spot). The emcee and celebrity panelists were permanent members of the TTTT series and regularly appeared on numerous shows throughout the "season." Each was recognized by the viewing public as an entertainment personality or celebrity. The emcees included such widely known persons as Bud Collyer, Garry Moore, Bill Cullen, and Joe Garagiola. The celebrity panelists included hosts of other game shows, actors and comedians, TV news people, commentators, sportscasters, athletes, and former politicians. Specifically, panelists included such people as Gene Rayburn, Allen Ludden, Kitty Carlisle, Peggy Cass, Nipsey Russell, Hugh Downs, and Dick Clark. The three contestants used in each spot were comprised of a "real person" and two "imposters."

At the beginning of each TTTT show, the announcer introduced the emcee, who made a brief statement introducing the first spot. The four celebrity panelists were then introduced, followed by the appearance on the stage of the three contestants involved in the first spot. Each contestant would announce that he was the particular real person who was the

subject of the spot. Of course, only one contestant was the real person. The other two contestants were imposters. The emcee then read a short prepared statement or "affidavit" that related the story of the real person. A sample prepared statement is as follows:

I, John Fulton Short, an American, am a professional bullfighter and illustrator. I have fought bulls and exhibited my paintings in both Mexico and Spain where I am known as "El Yanqui." I fought my first bull in 1953, and, to date, I have fought and killed 53 bulls.

Signed John Fulton Short

The affidavit having been read, each member of the panel in turn then asked questions of each contestant. The panelists' goal was to identify the real person. Each panelist had one minute in which to question the contestants and within that alloted time was able to ask five to seven questions. The ringing of a bell marked the end of questioning by each panelist.

The real person was required to answer all questions truthfully. The imposters were not required to do so. Instead, they attempted to assume the identity of the real person and answered questions accordingly in an attempt to mislead the panelists.

Once all the questioning was completed, each panelist marked on a card the number 1, 2, or 3 to designate his selection of the particular contestant he believed to be the real person. The panelists might state some reason, humorous or serious, to explain his vote. Next, the emcee would ask the real person to identify himself, for example, "Will the real John Fulton Short please stand up." The real person and the imposters then would engage in a discussion with the emcee and the panelists with respect to details of their lives.

The outcome of each particular spot was undetermined at the time the spot started. The panelists competed individually against the contestants and each other. The panelists were instructed by the producers of TTTT not to reveal any information that would lead to identification of the real person by the other panelists and thereby eliminate the competitive factor. The three contestants were each guaranteed $50 for appearing on TTTT, and, if all four panelists voted incorrectly, the three contestants divided $500. In addition to the cash

awards, the contestants were given gifts of nominal value, such as costume jewelry, perfume, etc., supplied by advertisers. Some contestants were reimbursed for travel expenses.

An individual was selected to participate on TTTT as a "real person" because of his connection with an event, achievement, or happening that petitioner perceived to be of interest to the television audience. TTTT had the same audience appeal as such contemporary shows as "Real People" and "That's Incredible." A common characteristic of TTTT and these shows is that they all communicate a noteworthy aspect of an individual that is of interest to the viewing public. Set forth below is a representative list and brief descriptions of certain real persons who appeared on TTTT shows that were taped between April 8, 1975, and March 30, 1976, for telecasting during the season commencing in the fall of 1975.

Roy Volker is a professional treasure hunter. As such, he found the single most valuable coin ever discovered—the 1715 Eight Escuedo Spanish Gold Royale. He's written a book for potential treasure hunters which informs you, not only where to search, but also how to clean, care for and dispose of what you find. It's titled TREASURE UNDER YOUR FEET.

Ed Feinhandler won the ugly man contest for 4 years. He's the first person to win the title 3 consecutive times since the contest began back in 1961 and the only one to win without the use of makeup.

Benson Huggard is a long-distance swimmer. He began distance swimming in 1961 when he bet a lady 14 years his senior...he lost the bet. Since then he's broken ten world records.

Traphes Bryant has served the equivalent of six terms in the White House...mostly in the dog house. He's been the kennel keeper at the White House for four presidents.

George Sroda is an oligo-chaetologist...and expert on worms. At present, he owns the nation's largest experimental worm laboratory and owns two million worms.

Arthur Weiner has crashed over one thousand parties. As New York City's most un-invited guest, he's barged in on every conceivable type of function—after theatre parties, fashion shows, art gallery galas, etc.

Joan Haas is a former model and hairdresser. Her business career ended because of her increasingly worsening health...Bright's Disease. Since then, she's had 21 major operations and quite literally is part human and part machine. In some medical circles, she is known as "the six million dollar woman."

Theodore W. Roth is considered to be America's foremost probate investigator. As head of "MISSING HEIRS, INTERNATIONAL", he has travelled all over the world finding missing heirs.

Anna Leider won first prize in the National Football League Bicentennial Scholarship Essay Contest. For winning the contest, she received an NFL watch and pendant, a birthday call from Commissioner Rozelle, and a $10,000 scholarship for the college of her choice.

Cecil Saxby is the retired chief of detectives for Scotland Yard. Mr. Saxby was one of the men responsible for rounding up the perpetrators of the notorious London train robbery.

Theodora Fitzgibbon has authored a gaggle of books on food. Her latest traces the origins, history and recipes of those comestibles that are popular in Europe and North America.
[Reproduced literally.]

TTTT's staff continuously did research in order to maintain and add to TTTT's files pertaining to potential real persons and likely imposters who might be selected to appear on unspecified future shows. Although individual shows required varying amounts of preparation time, preparation of a typical TTTT show had to be commenced many months in advance of its taping. In connection with their research, staff members read books, magazines, and 30 to 50 newspapers a week. TTTT's staff often selected as "real persons" people who had received coverage in newspaper articles. At times, the staff received referrals from public relations contacts.

Although ideas for real person selections were sometimes derived from newspapers, in selecting spots for the syndicated TTTT shows, Mark Goodson, petitioner's president, did not desire to use real persons whose stories could be described as material for contemporaneous headline features in the news media, but instead preferred real persons with more general stories. In Mr. Goodson's view, general stories, while frequently also newsworthy, retained audience appeal longer than headline features and accordingly were more suitable for syndication. There were instances when a real person appearing on TTTT also appeared on variety and interview shows such as "The Today Show."

After the number of potential real persons was narrowed down, those remaining under consideration as potential real persons had to be interviewed by TTTT's staff for personality, audience appeal, stage presence, and ability to undergo ques-

tioning by, and engage in small talk with, the celebrity panelists and the emcee.

After the real person for a particular TTTT spot was selected, potential imposters had to be located and interviewed. Imposters were selected, in part, on the basis of their audience appeal, stage presence, and ability to undergo questioning and to engage in small talk. In addition, imposters had to possess characteristics and personalities that would make it likely for them to be mistaken by the panelists for the real person. On occasion, the TTTT production staff had difficulty locating suitable imposters and found it necessary to resort to stopping people on the street in search of imposters. Once imposters were selected, they had to be briefed by TTTT's production staff and prepared to emulate the real person. In addition, all contestants, the real person and the imposters, would participate in an orientation session during which the contestants familiarized themselves with the set and format of the show. The efforts of the TTTT production staff in preparing imposters to act out the real person were essential to the success of TTTT. The importance of the staff's efforts has been described as follows:

> The solution to playing *To Tell The Truth* * * * lay in exhaustive briefing. Having rounded up two plausible-looking imposters to appear with a truth-teller, all three of them offering the same implausible story, * * * [the] staff would have to be willing, year in, year out, to spend several hours before each show with each team, forcefeeding them every conceivable fact about the person they'd be impersonating, coaching them on every related subject about which they would have to be knowledgeable. The procedure would be very much like cramming for an exam * * *. To further hone them for their ordeal, * * * [a member of TTTT's staff] would first have * * * [the] impersonators take part in a dress rehearsal in front of a stand-in panel whose job it was to try to trip them up.[3]

Unlike the contestants, the celebrity panelists and the emcee did not rehearse prior to the taping of the TTTT show. The show was unscripted, except for brief introductory remarks, the affidavit, and certain incidental remarks.

TTTT was commonly known in the television industry as a game show and was marketed and promoted as such. The production staff and the celebrity panelists considered TTTT

---

[3]M. Fabe, TV Game Shows 171–172 (1979).

to be a game show as that term is used within the industry. Mr. Goodson has stated on many occasions that "TTTT was the most golden game show idea of all." Unlike many game shows, however, TTTT did not generate audience appeal by rewarding participants with large prizes. Rather, TTTT's emphasis was on presenting human interest stories through the format of a game. In the view of the producers, the story of the real person, the verbal interplay among the celebrity panelists, the emcee, and the contestants, and the viewing public's participation in the selection process were the features of the show that generated audience appeal and resulted in a marketable television series.

During petitioner's fiscal years ended March 31, 1970, through March 31, 1978, petitioner derived income from shows taped for its "seasons" I, II, III, IV, V, VI, VII, VIII, and IX. A "season," as used herein, means the series of shows intended to be shown over a 52-week period commencing in the fall of one year and running into the next year. During the years in issue, TTTT was taped to be syndicated to various television stations throughout the country. One week's set of five shows would be taped on one day of the week. At that same time, five additional shows for taping the next week would be in the final stages of preparation, and the five shows to be taped two weeks thereafter would be in more preliminary stages of preparation. The programs were distributed by an independent sales representative, who was paid a commission for arranging to license TTTT to individual television stations. Different licensees of TTTT televised different shows on different dates from other licensees. A method known in the industry as "bicycling" was employed to distribute the TTTT tapes to the various television stations airing the show across the country. The TTTT tapes were rotated, on a geographic basis, among stations for televising. For example, a specific show would be televised in successive weeks in Philadelphia, Harrisburg, Pittsburgh, Buffalo, Scranton, etc.

In a typical season, petitioner produced 195 taped TTTT shows. TTTT's licensee was obligated to televise the number of weeks of shows that were produced (often 39 weeks), and the licensee was further obligated to fill out the year with reruns selected exclusively by petitioner from the same 39 weeks of shows. Thus, at a minimum, 13 weeks of shows (65 shows) were

rerun by every station licensed to televise TTTT programs during the license year.[4] As a rule of thumb, roughly 25 percent of the TTTT shows were rerun on a particular station to fill out or complete the season.

The parties have stipulated that, during the years involved herein, there were approximately 22,419 showings of weeks of TTTT shows on television stations in the United States.[5] The 22,419 total showings of weeks of TTTT shows were comprised of approximately 16,373 initial showings and 6,046 reshowings on the same stations. Three hundred and ten shows (1.38 percent) were rerun by a particular station more than 52 weeks after the initial showing on that station.[6] As a result of several factors, including the bicycling method of distribution and the adding of another station in a subsequent season to the syndicated list, initial showings on certain stations occurred in subsequent seasons. A total of 4,227 (18.85 percent) repeat showings of weeks of tapes were telecast on a particular station during a season (September 1 through August 31) following that in which some television stations had first televised them. Generally, the last showing anywhere occurred within 2 years of the initial showing.[7]

---

[4]In some seasons, the 52 weeks of shows were comprised of 35 weeks of new shows and 17 weeks of reruns.

[5]This number was computed by multiplying the number of stations televising TTTT shows by the number of weeks televised. In the aggregate, individual shows of TTTT were telecast approximately 110,000 times on television stations in the United States.

[6]The 310 shows referred to were generally individual shows rather than full weeks of shows, and the rerun percentage is actually somewhat overstated.

[7]The following excerpt from one of the documents stipulated into evidence may help the reader visualize the foregoing statistical analysis:

| Show number | Date taped | First date shown | Last initial showing | Last date shown | Number of weeks shown |
|---|---|---|---|---|---|
| 118 | 2/29/72 | 8/28/72 | 12/16/74 | 12/16/74 | 49 |
| 119 | 3/07/72 | 9/04/72 | 12/23/74 | 12/23/74 | 45 |
| 120 | 3/14/72 | 9/11/72 | 12/30/74 | 12/30/74 | 48 |
| 121 | 3/21/72 | 9/11/72 | 1/06/75 | 1/06/75 | 48 |
| 122 | 3/28/72 | 9/18/72 | 2/03/75 | 2/03/75 | 48 |
| 123 | 4/04/72 | 9/11/72 | 1/06/75 | 1/06/75 | 51 |
| 124 | 4/11/72 | 9/11/72 | 8/12/74 | 12/30/74 | 78 |
| 125 | 4/18/72 | 9/18/72 | 1/13/75 | 1/13/75 | 45 |
| 126 | 4/25/72 | 9/25/72 | 12/09/74 | 12/09/74 | 48 |
| 127 | 5/02/72 | 10/02/72 | 8/05/74 | 12/30/74 | 78 |
| 128 | 5/09/72 | 10/09/72 | 12/16/74 | 12/16/74 | 48 |
| 129 | 5/16/72 | 10/16/72 | 8/26/74 | 10/21/74 | 81 |
| 130 | 5/23/72 | 10/23/72 | 12/23/74 | 5/05/75 | 46 |

The celebrity panelists and the emcee provided their services under separate contracts with petitioner. These contracts provided that the panelists and emcee would be compensated for a fixed number of shows per week (usually five shows) and also provided that they would be paid additional compensation if the particular show in which the individual performed was selected by petitioner to be one of the shows to be rerun. The panelists and the emcee were paid for subsequent showings in accordance with their separate agreements with petitioner.

A permanent TTTT staff of not less than 15 people was required to perform all functions preparatory to the taping of the TTTT shows. In addition, each TTTT show required a cast of 4 panelists, 1 announcer, 1 emcee, and 6 or 9 contestants. Finally, 24 or more people were made available to TTTT, for a fee, by a television network for purposes of actually taping the shows. These people included, among others, camera persons, stagehands, wardrobe handlers, makeup artists, and audio and lighting technicians. In the aggregate, 49 to 54 persons were involved in the process of preparing, performing, and taping each individual half-hour show.

All costs incurred by petitioner in connection with the production of TTTT were incurred in the United States. These costs were reported by petitioner. in its Federal income tax returns for all years here material and were recognized by respondent as capital in nature, to be recovered by depreciation through the "income forecast method" over the economic lives of such tapes, and not as current expenses deductible at the time paid or incurred. The following schedule sets forth petitioner's "income forecast method" of recovering its costs of TTTT tapes placed in service during the years in issue:

| Placed in service FYE— | Approximate percentage recovered first year | Approximate percentage recovered second year | Approximate percentage recovered third year |
|---|---|---|---|
| 1973 | 16% | 59% | 25% |
| 1974 | 27 | 56 | 17 |
| 1975 | 31 | 51 | 18 |
| 1976 | 27 | 55 | 18 |
| 1977 | 30 | 62 | 8 |
| 1978 | 54 | 42 | 4 |

Petitioner claimed investment tax credits and carryovers and carrybacks of such credits for its costs incurred in connection with TTTT under the method provided in section 48(k)(2), I.R.C. 1954. There is no dispute between petitioner and respondent over the amount of the investment tax credits to which petitioner is entitled if petitioner is otherwise entitled to claim such credits. The following schedule sets forth the amounts of those credits:

| FYE— | Credit | FYE— | Credit |
|------|--------|------|--------|
| 1973 | $32,059 | 1976 | [8]$130,160 |
| 1974 | 35,634 | 1977 | 113,416 |
| 1975 | 41,547 | 1978 | 152,285 |

Respondent's statutory notice of deficiency disallowed the claimed investment tax credits, stating as follows:

It is determined that the investment credits claimed in the amount of $32,059.00; $35,634.00; $41,547.00; $65,080.00; $113,416.00; and $152,285.00, respectively, (a total of $440,021.00) for the respective taxable years ended March 31, 1973 through March 31, 1978 inclusive, on video tapes of the program "To Tell The Truth" are disallowed because the property does not qualify for the investment credit under sections 38 and 48(k)(1)(B) of the Internal Revenue Code.

OPINION

Section 48(k)(1) provides, in part, that an investment tax credit is allowable to a taxpayer with respect to any motion picture film or video tape if such film is new section 38 property (determined without regard to useful life) and if such film is a qualified film. In defining a qualified film, section 48(k)(1)(B) provides as follows:

(B) QUALIFIED FILM DEFINED.—For purposes of this subsection, the term "qualified film" means any motion picture film or video tape created primarily for use as public entertainment or for educational purposes. Such term does not include any film or tape the market for which is primarily topical or is otherwise essentially transitory in nature.

Respondent, in section 1.48–8(a)(3)(iii), Income Tax Regs., has interpreted the foregoing language as follows:

---

[8]The amount of the 1976 credit claimed on petitioner's return was increased by the examining agent.

(iii) *Topical or transitory films and tapes.* The term "qualified film" does not include any film or tape the market for which is primarily topical or is otherwise essentially transitory in nature. *A film or tape is topical or essentially transitory in nature if it primarily deals with events and personalities of current interest at the time the film or tape is placed in service.* It does not matter that a film or tape which is topical or essentially transitory in nature may be shown in subsequent years or is actually shown in subsequent years. These films or tapes include news shows such as the evening news and news specials relating to current affairs, interview shows such as "The Tonight Show" or "Meet the Press", *game shows*, award shows, and shows consisting of sporting events. Similarly, variety shows do not qualify for the credit since they present entertainers primarily as personalities of current interest, as opposed to dramatic or situation comedy shows which present entertainers as characters in a dramatization. Topical or transitory films and tapes do not include, however, dramatized recreations of recent events. [Emphasis added.]

Petitioner's primary position is that the market for TTTT tapes was neither "primarily topical" nor "essentially transitory" within the meaning of section 48(k)(1)(B) and, therefore, that it is entitled to the investment tax credit (ITC) irrespective of whatever meaning may attach to section 1.48–8(a)(3)(iii), Income Tax Regs. Petitioner would have us hold that the regulation is invalid at least in part, on the grounds that it not only exceeds the scope of the statutory provision it purports to administer, but also is inconsistent with the language of the statute. In addition, petitioner contends that to the extent that the regulation imposes a blanket rule that game shows are to be denied the investment tax credit, promulgation of the regulation violated the Administrative Procedure Act (5 U.S.C. sec. 553, et seq.) because the provision concerning game shows was not included in the proposed regulations, as published in the Federal Register, but was added to the final regulations without any further publication or notice that game shows would be dealt with in the regulations. Petitioner alternatively contends that this Court could sustain the regulation and still hold for petitioner by reading the regulation's game show provision in a restrictive manner. One suggestion advanced by petitioner is that the Court distinguish between various game shows and conclude that a show such as TTTT, in which the "game" aspect is subordinate to the presentation of durable human interest stories, is not included in the term "game shows" as used in section 1.48–8(a)(3)(iii), Income Tax Regs. Another suggestion

advanced by petitioner is that the Court read the game show provision to deny the ITC only to those game shows, the markets of which, *in fact*, are topical or transitory in nature, and find that the market for TTTT was not topical or transitory.

The primary thrust of respondent's counter to petitioner's position is that petitioner has failed to show that the Commissioner was arbitrary and capricious in promulgating the regulation at issue. Respondent, in fact, submits that the regulation is unassailable and fully consistent with the congressional mandate. In addition, respondent contends that the game show provision is not susceptible to the restrictive interpretation urged by petitioner. Instead, according to respondent, the game show provision removes game shows unqualifiedly from being eligible for the ITC. In short, it is respondent's position that petitioner cannot prevail herein unless petitioner can show that TTTT was not a game show or that section 1.48–8(a)(3)(iii), Income Tax Regs., is invalid.

We have not heretofore been called upon to address the parameters of section 1.48–8(a)(3)(iii), Income Tax Regs. Accordingly, we think it appropriate to begin by discussing the background leading up to the enactment of section 48(k) and the promulgation of the regulation in question.

Congress enacted the ITC provisions in the Revenue Act of 1962.[9] The stated purposes of the ITC was to encourage investment in the United States, thereby stimulating domestic employment and economic activity. S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 717.

Between the enactment of the original ITC legislation in 1962 and 1971, it was unclear whether (and if so, under what circumstances) the ITC was available for motion pictures or television films. However, in *Walt Disney Productions v. United States*, 327 F. Supp. 189 (C.D. Cal. 1971), affd. with modifications 480 F.2d 66 (9th Cir. 1973), cert. denied 415 U.S. 934 (1974), the court held that motion picture films were tangible personal property eligible for the ITC, and invalidated section 1.48–1(f), Income Tax Regs., to the extent that it required allocation of the entire production costs of film negatives to the intangible copyright. The legislative history of

---

[9]Pub. L. 87–834, sec. 2, 76 Stat. 962.

the Revenue Act of 1971[10] expressly approved the decision of the District Court in the *Disney* case. S. Rept. 92–437 (1971), 1972–1 C.B. 577–578.

Despite the *Disney* case and the expression of congressional approval, a number of issues surrounding the availability of the ITC with respect to films remained unresolved. Unsettled issues included the determination of the useful life of the film, the determination of the basis with respect to which the ITC was to be calculated, and the determination of the effect of predominant foreign usage of the film.

Congress believed it desirable to eliminate the uncertainties in the state of the law, to prevent costly litigation generated by these uncertainties, and to foster accurate investment planning for the movie industry in future years. H. Rept. 94–658 (1975), 1976–3 C.B. (Vol. 2) 880; S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 223. Accordingly, Congress directly addressed the availability of the ITC by enacting section 48(k) as a part of the Tax Reform Act of 1976.[11] On the issue of useful life, Congress decided to allow taxpayers to take a two-thirds credit on all their qualified films, without regard to the useful lives of particular films. See section 48(k)(2); H. Rept. 94–658, *supra*, 1976–3 C.B. (Vol. 2) at 881; S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 224. Alternatively, taxpayers are entitled to elect to determine useful life on a film-by-film basis, in which case the useful life of the film will be treated as having ended when 90 percent of the basis of the film is recovered through depreciation. See sec. 48(k)(3); H. Rept. 94–658, *supra*, 1976–3 C.B. (Vol. 2) at 881; S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 224. On the issue of foreign usage, Congress recognized that the major purpose of the ITC is to create jobs in the United States and decided to provide that the amount of the ITC in the case of motion picture and television films is to depend generally on the place of production of the film, rather than on the place where revenues are received from showing the film. See sec. 48(k)(4); H. Rept. 94–658, *supra*, 1976–3 C.B. (Vol. 2) at 880–881; S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 224.

In addition to addressing issues relating to useful life and foreign usage, Congress attempted to clarify in general which films would be eligible for the ITC. In this endeavor, Congress

---

[10]Pub. L. 92–178, 85 Stat. 497.
[11]Pub. L. 94–455, sec. 804, 90 Stat. 1591.

enacted section 48(k)(1), the provision most directly applicable in the instant case. As noted previously, that section makes the ITC available only with respect to a "qualified film," which is defined to mean "any motion picture film or video tape created primarily for use as public entertainment or for educational purposes." The term "qualified film" expressly does not include "any film or tape the market for which is primarily topical or is otherwise essentially transitory in nature." The statute does not define the foregoing exclusionary language. Furthermore, the legislative history is not altogether illuminating with respect to the congressional intent underlying the statutory language in that it does not give a substantive explanation of that language but merely provides examples of films Congress considered as qualifying and nonqualifying. The relevant legislative history states as follows:

For the future, as a general rule, * * * taxpayers are to receive two-thirds of a full credit for all their films regardless of the actual useful life (or foreign use) of any particular film. This rule will apply to all films placed in service * * * regardless of whether any particular film had a useful life of 7 years or more (so that it would be entitled to a full credit if judged on an individual basis), or less than 3 years (so that it would not be entitled to any credit if judged separately). The credit is to be available only for "qualified films", i.e., motion picture films or television films or tapes created primarily for use as public entertainment, and educational films, i.e., generally films used in primary or secondary schools, colleges and universities, vocational and post-secondary educational institutions, public libraries and government agencies (thus, for example, excluding industrial training films). Also, the credit would be available for TV pilot films and dramatic or comedy series, such as "Mod Squad" or "The Mary Tyler Moore Show." However, the credit would not be available for films which were topical or transitory in nature, such as news shows, interview shows such as "Johnny Carson" or "Firing Line", or films or tapes of sports events, even though some of these shows might be shown in subsequent years. * * * [S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 224–225; fn. ref. omitted.]

See also H. Rept. 94–658, *supra*, 1976–3 C.B. (Vol. 2) at 881.

Presumably, the statutory "topical or transitory" test was intended to serve as a replacement for a useful life determination. As indicated previously, section 48(k) was enacted in part to eliminate the uncertainty existing under prior law with respect to the determination of useful life. In order to achieve that goal, Congress provided a general rule that permitted taxpayers to claim a two-thirds credit on all qualified films

regardless of useful life. However, Congress apparently determined that inasmuch as other types of qualifying property were not entitled to any credit if their useful lives were less than 3 years, a film or tape, the market for which is primarily topical or transitory in nature, should also be excluded from the benefits of the credit since it reasonably could be expected to have a useful life of less than 3 years. Thus, it is stated in the legislative history that "A taxpayer is not to receive a credit for any films of a transitory or topical nature (because almost all of these films have a useful life of less than three years)." H. Rept. 94–658, *supra*, 1976–3 C.B. (Vol. 2) at 888. Notwithstanding the foregoing, it is clear that Congress did not intend to equate the "topical or transitory" test with a less-than-3-year useful life. The legislative history makes it clear that an otherwise qualifying film is entitled to the ITC even if it has a useful life of less than 3 years. See S. Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 224; H. Rept. 94–658, *supra*, 1976–3 C.B. (Vol. 2) at 881. Moreover, section 48(k)(1)(A)(i) expressly provides that the determination of whether the credit is allowable with respect to a film or tape is "determined without regard to useful life." We think that a fair reading of the precise statutory language, when coupled with the surrounding legislative history, suggests that Congress intended to deny the ITC to films that reasonably can be expected to become dated very rapidly.

Having reviewed the legislative background leading to the enactment of section 48(k), we turn now to the administrative background leading to the promulgation of the regulation in question. The regulations under section 48(k) were issued in proposed form by notice published in the Federal Register on December 20, 1977.[12] The proposed regulations did not include any reference to game shows, nor did the background information that accompanied the notice issuing the proposed regulations contain any statement with respect to the treatment of game shows. It was only in the final regulations, issued on April 5, 1979, without any further notice of proposed regulations, that the term "game shows" first appeared in the regulations.[13] The background information accompanying the

---

[12]42 Fed. Reg. 63791 (1977).
[13]44 Fed. Reg. 20416 (1979).

final regulations provided as follows with respect to the inclusion of the game show provision:

> The notice of proposed rulemaking provided that variety shows do not qualify for the credit because they deal with personalities of current interest. Several comments were received which suggested that the proposed rule was inappropriate. Nevertheless, examination of the legislative history leads to the conclusion that Congress did not intend that a mere video and sound recording of a *game*, performance, or event would *automatically* qualify for the credit. Accordingly, the proposed rule has been adopted substantially unchanged. [Emphasis added.]

Respondent, in section 1.48–8(a)(3)(iii), Income Tax Regs., attempted to supply the otherwise missing definition of a "film or tape the market for which is primarily topical or is otherwise essentially transitory in nature." He did so by incorporating in the regulations what we will henceforth refer to as the "current interest test." Under the current interest test, "A film or tape is topical or essentially transitory in nature if it primarily deals with events and personalities of current interest at the time the film or tape is placed in service." In addition to supplying a substantive definition of a topical or transitory film, respondent's regulation enumerates examples of such films. One such example, of course, is a game show.[14]

Petitioner's attack on the regulation focuses on both the current interest test and the game show provision. We will focus our analysis on the current interest test before turning to the game show provision.

Petitioner objects to the current interest test on the ground that it focuses on the *format or content* of a film, whereas the statute actually focuses on the *market* of the film. Respondent defends the current interest test by stating that the statutory reference to the *market* of a film does not preclude disqualifying a film on the basis of its format. Indeed, according to respondent, the legislative history specifically indicates that certain types of films or tapes, such as those of sporting events,

---

[14]For a more exhaustive discussion of the history underlying the enactment of sec. 48(k) and the promulgation of respondent's accompanying regulations, see Williams, "The Investment Tax Credit In Connection With Record Masters And Motion Pictures—The Only Game In Town," 52 S. Cal. L. Rev. 1121 (1979); Bennett & Forester, "The Investment Tax Credit for Motion Picture and Television Films and Tapes—The Unique and New Rules under the Tax Reform Act of 1976," 1979 S. Cal. Tax Inst. 295.

are to be treated as disqualified films or tapes based on their format and content. It is apparently respondent's position that, if a film primarily deals with events and personalities of current interest, the market for the film is necessarily "primarily topical or otherwise essentially transitory in nature."

For the reasons set forth below, we have concluded that petitioner's TTTT shows did not deal primarily with events and personalities of current interest at the time the tapes were placed in service. Therefore, we need express no opinion with respect to the validity of the regulations' current interest test.

Petitioner's TTTT shows presented durable human interest stories whose audience appeal was as potentially long-lasting as that of many situation comedies or dramatic shows. In other words, the content of TTTT was not such that it would cause the tapes to become rapidly dated as might that of a sporting event or the evening news. The stories told on TTTT concerned, for example, the lives of a professional treasure hunter, the winner of an ugly man contest, a long-distance swimmer, the kennel keeper at the White House, and an expert on and owner of worms, to name just a few. Certainly, these stories would be as interesting today as they were when the shows were produced approximately a decade ago. In other words, the passage of time generally did not affect the original appeal of the subject matter. Thus, the subject matter of TTTT was not limited to events and personalities of current interest. Its subject matter was more general or historical in scope, rather than the recordation of the winner of a sporting event or the announcement of a political happening or the commission of a crime.

In support of his assertion that the subject matter of TTTT was topical in nature, respondent states that the fact that TTTT's staff researched 30 to 50 newspapers a week to locate candidates to appear as real persons, leads to the inevitable conclusion that the real persons possessed certain attributes rendering their stories topical in nature. Further, respondent points out that there were several instances where such real persons also appeared on various news-oriented television shows such as "The Today Show." Respondent asks how, if individuals selected to appear on TTTT as real persons categorically did not possess any attributes rendering their

stories topical in nature, can their appearances on such news-oriented programs be explained.

We think respondent's observations highlight the difficulty of applying the rather slippery and elusive current interest test. We scarcely think that the fact that a particular personality or event may be carried in print or even on a news program a fortiori eliminates the long-lasting appeal of that personality or event. The Court takes judicial notice of the fact that newspapers quite often, and news programs occasionally, cover stories of persons which are of general human interest, regardless of whether those persons can boast of current newsworthy accomplishments. Furthermore, the mere fact that a personality has achieved a currently newsworthy feat does not mean that the interest in that feat is, per se, fleeting.

As a practical matter, since the object of the TTTT show was to try to ascertain which contestant was the real person, the producers of TTTT simply could not use a person who was readily recognizable by the panelists or the viewing public in general. To have done so would have frustrated the very purpose of the show by eliminating the element of suspense. Furthermore, the producers of TTTT did not wish to use stories that involved a contemporaneous news story because audience appeal for a contemporaneous news story would tend to be too short-lived for successful syndication. TTTT shows were taped as many as 4 to 6 months in advance of their first being televised, and preparations for each tape generally had to be commenced a number of months in advance of actual taping. Individual TTTT tapes were thereafter telecast over various television stations at different times, extending over a period of many weeks following the initial telecast. Many of the TTTT tapes were last telecast 2 to 3 years after the particular tapes were made. The extended time required for the preparation, production, distribution, and telecasting of each TTTT tape made it absolutely imperative, as a practical business matter, that the tape present subject matter without restrictive time limitations if the TTTT show was to be successful in syndication. It could not focus upon a celebrity of the moment.

As further support for his contention that petitioner flunks the current interest test, respondent advances the argument that each individual member of the viewing public would be

interested in watching only the initial telecast on a particular station and would not be interested in watching the same show again because the element of surprise no longer would be present. We find respondent's argument unpersuasive and point out that if respondent's argument were accepted as valid, it would lead to the disallowance of the ITC for virtually all types of films or tapes. After all, we suspect that the interest of a viewer in seeing for a second time the same situation comedy or drama has lessened from the first viewing. The current interest test, properly read, must focus on whether a particular film or tape is of sufficiently long-lasting interest that it reasonably may be expected to be rebroadcast over a period of time.

In sum, without expressing any opinion with respect to the validity of the current interest test, we conclude that petitioner's TTTT shows satisfy that test, and we move on to the game show provision.

At the outset, we reject any attempt by petitioner to remove itself from the scope of the game show provision by having us conclude that TTTT was not a game show. TTTT clearly was a game show within the ordinary understanding of that genre of show, albeit with its own unique emphasis and format. The critical question, as we view it, is one of interpreting the scope of the game show provision. Petitioner argues that, if the game show provision imposes a blanket rule that game shows unqualifiedly are not eligible for the ITC, as respondent contends that it does, then the regulation is unjustified and must fall. Alternatively, petitioner urges us to read the game show provision to deny the ITC only to those game shows the markets of which are, *in fact*, primarily topical or otherwise essentially transitory in nature.

Treasury regulations normally are given considerable weight by the courts and should be upheld unless they cannot be interpreted in a fashion consistent with the statutory language they seek to administer or they fail to harmonize with manifest congressional design. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 24 (1982); *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 501 (1948); *Fawcus Machine Co. v. United States*, 282 U.S. 375, 378 (1931); *Lykes Bros. Steamship Co. v. United States*, 513 F.2d 1342, 1350 (Ct. Cl. 1975). Furthermore, "legislative regulations," such as the

regulations issued under section 48, are entitled to even greater weight than regulations issued pursuant to the general authority granted by Congress under section 7805(a). *Fife v. Commissioner*, 82 T.C. 1, 15 (1984). Recognizing the principle that in interpreting a regulation, "the courts should, if possible, avoid a construction which will bring into question" its validity (see *Steen v. Commissioner*, 61 T.C. 298, 304 (1973), affd. per curiam 508 F.2d 268 (5th Cir. 1975), accord, *Dunn v. Commissioner*, 70 T.C. 715, 726 (1978), affd. 615 F.2d 578 (2d Cir., 1980)), we will not presume that respondent intended to lay down an inflexible blanket rule removing game shows unqualifiedly from the category of "qualified films." To so presume would require us to hold the regulation invalid for, if the market of a particular game show is not, in fact, primarily topical or otherwise essentially transitory in nature, the regulation effectively would eliminate the statutory allowance of the ITC to an otherwise qualifying film or tape. The regulation's examples can go no further than the substantive rule that they purport to exemplify.

Respondent argues, in support of his alleged blanket exclusion of game shows from the category of qualified films, that the legislative intent of section 48(k) was to allow the ITC only with respect to films or tapes that embody "lasting, permanent art." According to respondent, a film that embodies the work of script writers, directors, and editors and requires rehearsals and other production processes is regarded as a single, unique asset entitled to the credit; however, typically unrehearsed game shows were not intended to fall within the category of films qualifying for the ITC.

We find nothing in the legislative history, and certainly nothing in the statute, to support respondent's apparent contention that complete scripts and rehearsals were intended to be the touchstones of a qualifying film, and we seriously doubt that Congress intended for respondent to exercise his regulatory authority by assuming the role of an art critic qualified to pass judgment on whether a particular genre of films constitutes "lasting, permanent art." The evidence presented adequately establishes that the development of TTTT shows required a substantial creative effort and a substantial production process that normally entailed a great deal of preparation. The fact that TTTT, because of its nature,

required only limited scripts and rehearsals does not take away from the fact that the filming of TTTT shows required rather substantial preparation and the involvement of a large production staff. In addition, in responding to respondent's legislative intent argument, we must point out that it is crystal clear from the legislative history to section 48(k) that Congress, in adopting that provision, was concerned about promoting domestic employment in the entertainment field.[15] The types of jobs created in producing TTTT (camera persons, stagehands, wardrobe handlers, makeup artists, audio and lighting technicians, etc.) are the types of jobs that Congress surely sought to encourage in adopting the ITC provisions as they relate to movie and television films.

Respondent also argues that failure to read the regulation as imposing a blanket rule with respect to game shows would result in an entirely unworkable situation from an administrative standpoint, in that respondent would be required to engage in the tedious task of reviewing every game show imaginable in an attempt to apply a complicated factual test. We appreciate the burden our interpretation of the game show provision may impose upon respondent. However, in our view, it is a burden that the statute itself imposes on respondent. Respondent cannot eliminate by regulation a credit that the statute otherwise extends. The Supreme Court recently rejected a similar administrative convenience argument raised by respondent in defending a different regulatory provision and, in so doing, stated as follows:

What the Commissioner cannot do—because it is an "unreasonable" interpretation of the statutory language in light of its history and purpose—is to resolve the practical problems by eliminating the allowance altogether. Eliminating the allowance might make the statute "simpler to administer," * * * but it does so by ignoring the language of the statute, the views of those who sought its enactment, and the purpose they articulated. [*Commissioner v. Engle*, 464 U.S. 206 (1984).]

We hasten to add that we are not herein dealing with a congressional grant of regulatory authority specifically enabling respondent to administer the statute by setting up discrete classifications of films that are not eligible for the ITC

---

[15]See, e.g., S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 224, 227.

or presumptions to that effect, and we should not presume that respondent intended to do so.

We note that a more restrictive interpretation of the scope of the game show provision is fully consistent with respondent's explanation in the preamble to his final regulations that Congress did not intend that a video and sound recording of a game "would automatically" qualify for the credit. That is, respondent's explanation of the provision in no way suggested a blanket rule.

In light of our interpretation of the game show provision, our sole focus at this point should be towards determining whether the market for petitioner's tapes of TTTT shows was in fact primarily topical or otherwise essentially transitory in nature.[16] As we have noted, the statute does not supply a definition of a film or tape whose market is primarily topical or otherwise essentially transitory in nature, and the legislative history merely provides examples without giving a substantive definition. Accordingly, we think it reasonable to assume that Congress intended to use the words chosen in their ordinary, everyday sense. The term "topical" is defined to mean "of or relating to a place"; "local or designed for local application"; "referring to the topics of the day or place"; "of local or temporary interest." Webster's New Collegiate Dictionary 1222 (1979). The term "transitory" is defined to mean "tending to pass away"; "not persistent"; "of brief duration." Webster's New Collegiate Dictionary 1232 (1979). The examples used in the legislative history to illustrate the "topical or transitory" test are consistent with the ordinary, everyday understanding of the statutory language. Those examples (tapes of sports events, the evening news, and

---

[16]We recognize that by its terms, respondent's regulation inquires only into the content of a film or tape and not into such factors as actual market potential or history. We have already concluded that petitioner's TTTT shows satisfy respondent's regulatory current interest test; therefore, arguably we need go no further. However, our inquiry into petitioner's market is intended to implement our interpretation of the parameters of the game show provision (i.e., that the provision effectively denies the ITC to a game show whose market is topical or transitory in fact) and to be responsive to respondent's allegation that petitioner's market for the TTTT show was in fact short-lived. Our inquiry into petitioner's market is not intended to be responsive to section 1.48–8(a)(3)(iv), Proposed Income Tax Regs., which appears to provide a second distinct test with regard to whether or not a film or tape placed in service after June 3, 1982, is to be classified as a "qualified film." Whereas the existing regulations focus on the content of a film, the proposed regulations focus on the market of the film. Interestingly enough, the proposed regulations provide that "The market for a film or tape is essentially transitory in nature if, in the normal operation of the particular market for which the film or tape is produced, films or tapes are shown once."

interview shows) possess the common characteristic of becoming dated almost immediately. Moreover, each example given is of a tape or film that deals primarily with events or personalities of uniquely contemporary interest.

Under the facts presented in this case, we are convinced that the market for the TTTT tapes was not "topical" or "transitory" within the ordinary sense of these words. As we have previously stressed, those tapes presented durable human interest stories that were not merely "of local or temporary interest." The audience appeal of those stories was not frozen in locality or time, as might be the case with respect to sporting events, news programs, and interview shows. Therefore, the market for these tapes was not "topical." In addition, the facts reveal that petitioner's tapes were prepared for syndication, that they were first telecast as long as 6 months after they were taped, that individual episodes were rebroadcast time and again over various stations for as long as 3 years after they were taped and produced income during this entire period, that in each season of TTTT shows, licensees were required to show 13 or 17 weeks of·reruns, and that a small percentage (1.38 percent) of TTTT shows were rerun by a particular station more than 52 weeks after the initial showing on that particular station. Given these facts and statistics, it is impossible for us to characterize petitioner's market as one "of brief duration." Therefore, the market for those tapes was not "transitory."

Respondent has argued that the fact that a de minimis 1.38 percent of the TTTT shows produced during the years in issue were rerun by a particular station more than 52 weeks after their initial showings overwhelmingly indicates that the market for TTTT shows was essentially transitory. Respondent's argument is premised on entirely too narrow a view of petitioner's market and finds no support in the statute. During the years in issue, TTTT was taped to be syndicated to various television stations throughout the United States. Petitioner's market was clearly not limited to one particular television station. Further, respondent ignores the fact that petitioner's licensee was contractually required to show a number of the productions more than once, a fact inconsistent with the contention of transitory appeal.

In sum, we find the overall restrictive position advanced by respondent in this case to be at odds with the statute and its purpose to encourage investment and domestic employment and with the holdings of this Court, as well as other courts, that the investment credit provisions are to be liberally construed. See, e.g., *Lykes Bros. Steamship Co. v. United States*, 513 F.2d 1342, 1353 (Ct. Cl. 1975); *Minot Federal Savings & Loan Association v. United States*, 435 F.2d 1368, 1372 (8th Cir. 1970); *Northville Dock Corp. v. Commissioner*, 52 T.C. 68, 73 (1969), affd. per curiam 427 F.2d 164 (2d Cir. 1970).

In view of the conclusions reached herein, we hold that petitioner is entitled to receive the ITC with respect to its TTTT tapes.[17]

*Decision will be entered for the petitioners.*

---

[17] We commend petitioner, respondent, and amici curiae on the first-rate quality of all briefs submitted in this case.
[1] Hereinafter referred to as the Centre.